[No. 3113. Decided April 18, 1899.]

THE STATE OF WASHINGTON, *Respondent,* v. GEORGE WEBSTER, *Appellant.*

EVIDENCE—ACTS AND DECLARATIONS AS PART OF RES GESTAE.

A conversation between deceased, her husband, and one accused of her murder, prior to the homicide, is admissible in evidence as a part of the *res gestae,* where from the time defendant entered the house of the deceased until the homicide occurred there was a regular sequence to explain his intentions.

SAME—DECLARATIONS OF DECEASED AS RES GESTAE.

A conversation between a husband and his wife immediately after she received the fatal shot, in which she stated that she was shot fatally, and by whom the shot was fired, and implored her husband to take the children upstairs or they would all be killed, as the accused would shoot again, is admissible in evidence in a prosecution for her murder by the accused as a part of the *res gestae.*

CONFESSIONS—WEIGHT OF, AS EVIDENCE—QUESTION FOR JURY.

The weight of admissions of one accused of murder, made to the officers who had him in custody after his arrest, is for the determination of the jury, under Bal. Code, § 6942, in the absence of any evidence that such admissions were made under fear produced by threats.

HOMICIDE—EVIDENCE—INTENT AND RESPONSIBILITY.

Testimony that one accused of murder purchased saxeline and cantharides shortly before the homicide and learned from the

druggist how much was a dose, that he had them with him at the time of the homicide and offered a dose to the deceased, purporting to take one himself, and testimony as to the effect of the use of cantharides, is material, in connection with defendant's advances toward deceased and her daughter, in determining the question of deliberation and responsibility, in view of the suggested defense of insensibility, assumed to have occurred from the use of cantharides, or of whiskey, which he had been drinking.

EXHIBITS ADMISSIBLE IN JURY ROOM.

Exhibits properly introduced in evidence and explanatory of the evidence of witnesses may be taken to the jury room, under Bal. Code, § 5004, which permits the jury to take with them the pleadings and all papers received as evidence, except depositions or such documents as ought not, in the opinion of the court, to be taken from the person having them in possession.

SAME—DYING DECLARATIONS—HARMLESS ERROR.

Where a memorandum of a dying declaration made by a stenographer, but not read to deceased nor signed by her, which was read to the jury by defendant's counsel and offered in evidence and received and marked as an exhibit, was accidentally taken to the jury room, the error was harmless, when it could not in any event injure defendant.

Appeal from Superior Court, Spokane County.—Hon. Leander H. Prather, Judge. Affirmed.

*Del Cary Smith* and *James E. Fenton,* for appellant.

*John A. Pierce,* Prosecuting Attorney, for The State.

The opinion of the court was delivered by

Reavis, J.—Defendant was convicted of murder in the first degree. He was a farm laborer and had for several years been employed on farms in different portions of Spokane county. In the year 1896 he had been on the farm of the husband of the deceased, Lise C. Aspland, stayed all night, in the evening assisted the deceased in milking some cows, and in the morning rendered her husband like assistance. In May, 1897, the deceased, her husband, Andrew Aspland, and three children resided on a farm about four miles northwest of Cheney. About midnight,

or early in the morning of the 7th, the homicide was committed. On the previous day the defendant was in the town of Cheney, and while there drank liquor in several saloons. The extent to which he was under the influence of liquor while in Cheney and when he left there is not clear from the evidence. About seven o'clock in the evening defendant was ordered by a constable in Cheney to leave the town. In company with another man, whose name seems to be unknown, defendant left Cheney, going in a westerly direction. They separated before the defendant arrived at Aspland's, which was about nine o'clock in the evening. Defendant, upon arriving at Aspland's, desired admission to the house, was received, and was recognized by a son of Aspland, about thirteen years of age. He was not at first recognized by Aspland. The family were at the time in the kitchen, a large room where there was a bed. There were the deceased, two daughters, one aged thirteen and the other eleven, and the son, aged thirteen. It was rainy and stormy during the night. Defendant had with him a pint bottle of whiskey, only partially filled. He offered a drink of the whiskey to Aspland, the husband, who accepted the invitation and tasted the whiskey. He also offered the whiskey to the deceased, who likewise tasted it. He then drank himself. Defendant stated that he was looking for work, and Aspland said he desired a farm hand, and employed defendant at a stipulated price. An ordinary conversation about farming and similar topics then took place, when, about eleven o'clock, the family and defendant all retired for the night; the deceased and her two little girls occupying the bed in the kitchen, the defendant, Aspland and the little boy leaving the kitchen, going through an adjoining room, called the "parlor" by some of the witnesses, to a bedroom adjoining the parlor, and all retiring, the defendant being the last

5—21 WASH.

one who retired, in the room with Aspland, and himself
putting out the light. Within some ten minutes after they
retired the defendant complained of being warm, and was
told by Aspland to open a window, which he did. He then
remarked that he wanted a drink of water, and was told
by Aspland that he would find water in the rear of the
kitchen. He went through the kitchen, and outside, for
water. On returning, he passed through the kitchen, and
caught or squeezed the arm of one of the little girls, who
seemed to be asleep, and who cried out and was frightened.
He was told by the deceased to leave the room, but he then
asked the deceased if he might not stay in bed with them.
He was ordered out, and went and retired to the bed he had
left. The deceased, after the occurrence, arose and lighted
a lamp and locked the two doors to the kitchen. The de-
fendant, a short time after he returned to bed with
Aspland, arose and said he desired to take some medicine,
and was told where he could find a spoon. He got the
spoon and poured out his medicine, spilling some on the
pillow of the bed. He also offered some of this to Aspland,
who declined to take any. Defendant remarked that he
had taken it himself. Then he returned through the parlor
to the kitchen door and attempted to go in again, but found
the door locked, and then demanded that his hat and coat,
which had been left in the kitchen before he retired, be
given to him. He was told by the deceased to go back to
bed and he could get them in the morning. He then went
out of the room, on the outside, and around to a window
of the kitchen, lowered the window, and demanded his hat
and coat, stating that he would then go to Cheney. The
deceased told him she would hand him his hat and coat
through the window, and thereupon placed his hat upon a
broom and passed it through the top of the window to him,
and reached for the coat and was in the act of passing it
over the window when defendant shot through the window

with a revolver pistol, the ball striking the deceased in the
abdomen and fatally wounding her. Immediately after
the shot was heard the husband and son came into the
kitchen, the door of which was unlocked by the deceased
for them to enter, and deceased exclaimed that she was
shot fatally and stated by whom the shot was fired, and
implored her husband to take the children up stairs or
they would all be killed; that defendant would shoot again.
The husband thereupon took the children into an upper
room and returned to the kitchen with deceased. Deceased
was in agony and prayer, in view of approaching death,
and her husband remained in the room with her, but ob-
served the defendant back again in the parlor or bedroom
striking a match. The defendant said: "Who has been
shooting?" The husband said: "We know well enough."
The defendant then returned to bed and remained there
until arrested. The husband shortly afterward brought
the children again into the kitchen, where their mother
was, and went to a neighbor's, not far off, where a phy-
sician was sent for, and also two officers at Cheney, who
came to the residence of deceased at early dawn and took
the defendant into custody. Defendant, after he was taken
into custody, was taken into the kitchen where the de-
ceased was lying upon her bed, and she then stated he was
the man who shot her, and he also stated that he was sorry
for it. The defendant afterwards, while in the custody
of the officers, admitted that he shot the deceased. The
defendant, at a Cheney drug store, had bought a bottle of
cantharides and also one of saxeline or vaseline, which he
carried to the Aspland residence with him, and he had also
a half pint bottle of whiskey in his coat pocket in addition
to the bottle from which he offered the drink to Aspland
and wife. The bottle of whiskey, the bottles of cantharides
and vaseline and also a 38-caliber revolver were upon his
person, and were taken possession of by the officers and

produced at the trial. Mrs. Aspland died on the second
day after her removal to Medical Lake hospital, where a
surgical operation had been performed upon her. The
death was occasioned by the revolver shot in the abdomen.

1.   Numerous assignments of error are brought here
by counsel for defendant. They have been carefully ex-
amined, and only those which are deemed material in the
review of the case will be mentioned. The indictment was
good, under the doctrine heretofore announced by this
court. The law was fairly stated, as applicable to the case,
in the instructions of the court to the jury, and no revers-
ible error is perceived in the rulings of the court in the
selection of the jurors. The conversation between the de-
ceased, her husband and the defendant, prior to the shoot-
ing, was admitted on the trial, over the objection of de-
fendant's counsel. It is contended that such conversation
was not a part of the *res gestae,* but from the time the de-
fendant entered the house of Aspland until the shooting
occurred, there was a regular sequence to explain the mind
and intention of the defendant. The conversation and acts
were so closely related to the main fact that we do not
think the court abused its discretion in receiving this tes-
timony, and the same may be said with reference to the
conversation between the husband and the deceased imme-
diately after the shooting occurred. The objection to the
evidence of the officers who had the defendant in custody
after his arrest, relative to his admissions concerning the
wound inflicted upon the deceased, were, in the first place,
addressed to the court, and we do not think there was any
evidence submitted that such admissions were made under
fear produced by threats; and therefore, under § 6942,
Bal. Code, their weight, in view of the circumstances sur-
rounding them, was for the determination of the jury.

2.   Counsel for defendant insists earnestly upon the as-
signment founded upon the reception of testimony concern-

ing the bottles alleged to contain cantharides and saxeline, and also testimony concerning the effects of cantharides and saxeline, their uses and nature, maintaining that it was incompetent, irrelevant and immaterial, under the charge contained in the information. Testimony was received, over the objections of the defendant, that he purchased saxeline and cantharides at a drug store in Cheney, and that he had them with him at the time the shooting occurred; and also of the effect of the use of cantharides; and it is maintained by counsel that such testimony could only have been competent if the indictment charged murder committed in the attempt to commit rape. The court instructed the jury that, "in determining the guilt or innocence of the defendant, you cannot consider any of the evidence offered by the state as to any attempt on the part of the defendant to commit the crime of rape on the deceased or any of her daughters, as tending to prove the crime of murder committed in the perpetration, or attempted perpetration, of the crime of rape; but you may consider such evidence and circumstances surrounding such killing for the purpose of helping to explain the same and the defendant's connection therewith, if any." The defendant while in Cheney said to a saloon keeper where he was drinking, about the time he started out of town that he was "going out to get even with a Swede." The deceased and her husband were both Swedes. They had lived for many years on their farm, a simple and industrious life, and the defendant had been there before, as observed. At the time he purchased the cantharides in Cheney, he asked the druggist how much was a dose for a person, and was answered. He had, while in Cheney, exhibited a revolver. Thus, he started with the revolver, the bottle of whiskey, the bottle of saxeline and the bottle of cantharides, and went to the house of the deceased with them on his person, and offered the cantharides to the deceased

and her husband, and purported to take some himself. The
first witness cross-examined by defendant relative to the
defendant's actions in Cheney indicated the defense; that
is, the insensibility, from liquor or drugs, of the defendant
at the time the shooting occurred; and afterwards it was
developed in the defense that this insensibility was as-
sumed to have occurred from the use of whiskey or can-
tharides. Among the uses of cantharides which were shown
at the trial was that it was a poison and frequently used
by farmers externally in treating horses, and that used
internally it stimulated sexual passions, and in larger doses
produced coma and even death. The only fact shown by
defendant in explanation of the case made against him by
the state, which was absolutely clear and convincing, of
the homicide committed by defendant, was his insensi-
bility to everything that occurred after he returned to bed
from raising the window, as mentioned by the witnesses
for the state. His testimony after the window was raised
was as follows:

" Q.   What did you do after you raised the window?
A.   I went back to bed.
Q.   State what you did after that, what you next did.
A.   After that I don't remember what I did do.
Q.   You heard the testimony of Mr. Aspland about
your asking for a drink of water. State what the facts are
about that. State whether or not you recollect of asking
for a drink of water.
A.   I don't recollect that.
Q.   You heard his testimony as to his telling you that
you could get a drink of water out on the porch. State
what the facts are about that. Do you recollect that? State
what your recollection is about that.
A.   I don't remember anything after I laid there on
the bed that time.
Q.   When was the first time you remembered anything
after you raised the window and went to bed? When was
the next time that you recollect of anything occurring?

A.   I don't recollect of anything occurring until I heard some noise that sounded like people talking.

Q.   When was that?

A.   That was in the morning.

Q.   The next morning?

A.   Yes, sir.

Q.   About what time in the morning was it?

A.   Well, it was getting daylight; I guess it must have been about five or six o'clock.

Q.   Well then state what occurred after that.

A.   Well, I was sleeping and I woke up when I heard this noise and looked out, and I felt kind of numb and stupid,—and I saw a man looking into the window and some more on the outside, and so I laid down again.

Q.   What was the next thing that occurred? Go on and tell the jury what occurred after that.

A.   Then a minute after that Mr. Brown, the constable, and Corbett, I think it was, come in and arrested me.   .   .   ."

There was no effort to vary or controvert the evidence relative to the homicide introduced by the state. The evidence admitted, of defendant's acts and expressions from starting from Cheney, and while on his way to the Aspland farm, would seem to explain the design, object, motive, purpose, condition of mind and humor of the defendant. The chief characteristic of murder, distinguishing it from every other species of homicide, is malice prepense or forethought. This term is not restricted to spite or malevolence towards the deceased in particular, but it is understood to mean a general malignity and recklessness of the lives and personal safety of others, which proceed from a heart void of a just sense of social duty and fatally bent on mischief. This testimony illustrated the action of the defendant. His state of mind was material in determining the question of deliberation, and also his responsibility, in view of the suggested defense of insensibility.

3.   After the court had instructed the jury, it directed

that the bottle of whiskey, the bottle of cantharides, and that of saxeline or vaseline, might be taken by the jury, together with the papers in the case. Counsel for defendant assign this as error, under § 5004, Bal. Code. This section directs what may be taken by the jury to their consultation room, to-wit, the pleadings in the case, all papers which have been received as evidence on the trial, except depositions and copies of such parts of the public records or private documents given in evidence as ought not, in the opinion of the court, be taken from the person having them in possession. But the objection of counsel is met by the very well considered case of *Doctor Jack v. Territory,* 2 Wash. T. 101 (3 Pac. 832), in which the above section, which has been the existing law of the state and territory for many years, is construed. There it was held that exhibits properly introduced in evidence, and explanatory of the evidence of witnesses, might be taken to the jury room (in that case, which was a conviction for murder in the first degree, a hat and coat which were exhibits in the case, were taken to the jury room); and such has been the practice and the accepted construction of this section since then. The supreme court of California has held that the sending of exhibits to the jury room or withholding them is within the discretion of the court. *People v. Cochran,* 61 Cal. 548.

4.   A short time before her death, the deceased made a statement, relative to the cause of her death, substantially that it came from a revolver shot wound, and that the defendant fired the shot. From an examination of the evidence, there is no question but this statement was made *in extremis* and in immediate contemplation of death, and it was material and properly admitted. A physician, Dr. Semple, who had attended deceased, was present when her statement was made, and was called by the prosecuting attorney to testify as to the dying declaration. When the

witness was called, and had begun to testify, counsel for
the defendant asked him if the statement was not taken
down by a stenographer present at the time, and if he,
witness, had not a copy of such statement, which had been
extended by the stenographer in long hand.    The witness
answered that he had, but that he was testifying from his
independent recollection.    Counsel for defendant then in-
sisted that the memorandum made by the stenographer be
given to them, and the court directed the witness to hand
such paper to counsel for defendant.    Counsel for defend-
ant then proceeded to ask questions of the witness as to
the verity of the written statement, to which the witness
answered that the statement was substantially correct, as
he heard the declaration from the deceased.    Dr. Semple
was then examined by the prosecuting attorney and tes-
tified to the dying declarations of deceased, and counsel
for defendant then offered in evidence the statement taken
by the stenographer and written out in long hand.    The
prosecuting attorney interposed an objection to this state-
ment, but withdrew the objection upon the explicit state-
ment that it was introduced by counsel for defendant as a
part of their evidence.    The memorandum was then read
to the jury by defendant's counsel, and received and
marked an exhibit in the cause.    At the conclusion of the
case, this memorandum or exhibit accidentally went to
the jury room, and was before the jury, with the other
exhibits, during their deliberations.    Counsel for defend-
ant now assign a consideration of the same by the jury
as error, and cite the case of *State v. Moody,* 18 Wash.
165 (51 Pac. 356), as determinative of the controversy.
In that case there was an admission in evidence of the
dying declaration, in writing, of the deceased, over the
objection of defendant.    Such dying declaration included
the assertion of a threat.    In it the question was asked:
"Had he ever threatened before to injure you?" and the

answer was, "Yes." It was observed: "The universal rule is that the dying declarations are restricted to the act of killing and the circumstances directly preceding it and forming a part of the *res gestae.*" And that, "the court erred in not instructing the jury that this part or portion of the dying declaration [referring to the previous threat] should be disregarded." In that case the dying declaration also went to the jury, and it was said by the court, reversing it:

"Again, it is claimed that the court erred in allowing the dying declaration to go to the jury room, for the investigation of the jury, over the objections of the appellant. We think without any question that this was reversible error. The statute does not permit witnesses or depositions to go to the jury room, and for the very best of reasons. And certainly the dying declaration is in substance a deposition of a witness, the solemnity of the occasion simply taking the place of the oath which is ordinarily administered to a witness who subscribes to a deposition. No cases are cited on this proposition, but we think it so plainly falls within the ban of the statutes and of the law that the citation of authorities is unnecessary."

In that case the paper was read to, and signed by, the deceased. It purported to be the declaration taken at the time, and the witness who took it so testified, and it was admitted over the objection of defendant. In the case at bar the paper was one not taken by the witness testifying, was not read to deceased and was unsigned, and it was explicitly stated by counsel for defendant that it was a memorandum explanatory of the testimony of the witness Dr. Semple. It purported to carry with it none of the characteristics of a deposition. It was a mere paper memorandum, marked as an exhibit. It was evidence introduced for the defendant. And, finally, in view of the case as made, it could not injure the defendant, and therefore does not constitute reversible error. In the statement that

this memorandum accidentally went into the jury room, we are following the corrected statement of facts as found by a special commissioner under order from this court, and after the cause was submitted here.

After a most careful and deliberate consideration of the record in this cause, we are satisfied that the defendant was rightly convicted, and the judgment of the superior court is affirmed.

Gordon, C. J., and Dunbar and Anders, JJ., concur.