## V. R. HOPKINS v. STATE.

No. A-1501.   Opinion Filed March 29, 1913.

(130 Pac. 1101.)

1. **CONTINUANCE—Absent Witness—Diligence.** It is no abuse of discretion to overrule an application for continuance, where no diligence is shown to procure the attendance or to take the deposition of a nonresident witness.

2. **HOMICIDE—Verdict—Penalty.** Section 2275 of Comp. Laws 1909 (Rev. Laws, sec. 2319), authorizes the penalty of death at the discretion of the jury; and, if they find the defendant guilty of murder, they must designate in their verdict whether he shall be punished by death or imprisonment for life, and, when a plea of not guilty is entered to an indictment or information charging murder, the extreme penalty can be adjudged only upon the verdict of a jury fixing the punishment by death, only "upon a plea of guilty, the court shall determine the same." In such cases section 2028 and section 2029 of Comp. Laws 1909 have no application.

3. **JURY—Competency—Homicide.** Under section 6812, subd. 8, Comp. Laws 1909, (Rev. Laws, sec. 5859), providing, "If the ,offense charged be punishable with death, the entertaining of such conscientious opinion as would preclude his finding the defendant guilty of, in which case he shall neither be permitted nor com-

pelled to serve as a juror," held, where on a trial for murder a juror, who on his voir dire answers that his conscientious scruples against the death penalty are such as would preclude him from agreeing to a verdict of guilty, is incompetent to sit as a juror, and a challenge for cause by the state was properly allowed.

4. WITNESSES—Cross-Examination. On cross-examination of a witness, as a general rule, the party cross-examining should be confined to the matters concerning which the witness has been examined in chief, but this rule should be liberally construed so as to permit any question to be asked on cross-examination which reasonably tends to explain, contradict, or discredit any testimony given by the witness in chief, or to test his accuracy, memory, veracity, character, or credibility. This must necessarily include impeaching questions, although they may relate to matters independent of the questions testified to in chief.

5. SAME. When the cross-examination is directed to matters not inquired about in the principal examination, its course and extent are very largely subject to the control of the court in the exercise of a sound discretion; and, unless it affirmatively appears that this discretion was abused, the rulings of the court will not be reviewed on appeal.

6. EVIDENCE—Res Gestae—Self-Serving Declarations. Mere self-serving declarations, made to third parties by the defendant at a place distant from the scene of the homicide, are not admissible as a part of the res gestae; and, while the defendant may prove that he conversed with persons who were at the place he claimed to be, he cannot introduce telephone conversations there had which on his part appear to be self-serving declarations.

7. TRIAL—Declarations of Jury—Inspection. Where the jury in open court request permission to take with them to the jury room, to inspect during their deliberations, articles introduced in evidence, the granting or refusal of the request is within the discretion of the trial court, the exercise of which will not be reviewed on appeal without an affirmative showing that the discretion was abused, In so far as the case of Hansing v. Territory, 4 Okla. 443, 46 Pac. 509, conflicts herewith, it is overruled.

8. NEW TRIAL—Grounds. Where, on a trial for murder, the court permitted the jury. to take, on retirement, and to have the same in their possession in the jury room, while deliberating, the defendant's shotgun and the shells and shot which had been introduced in evidence, and it not being made to appear that they were used by the jury in a manner not consistent with the evidence, it cannot be said that the jury thereby received evidence out of court, and the statutory grounds as to new trials—section 6896, Comp. Laws 1909: "Second. When the jury has received any evidence out of court. Third. Or have been guilty of any misconduct by which a fair and due consideration of the case has been prevented"— do not apply.

9.  TRIAL—Declarations of Jury—Inspection—"Papers." While a shotgun, shells, and shot were not "papers" within Comp. Laws 1909, sec. 6864, authorizing the jury to take to the jury room papers received in evidence, the taking of such articles to the jury room did not constitute error, where they were not used or handled by the jury in a manner inconsistent with the evidence.

(Syllabus by the Court.) .

*Appeal from District Court, Okmulgee County;*
*Wade S. Stanfield, Judge.*

V. R. Hopkins was convicted of murder, and he appeals. Affirmed.

*M. M. Alexander* and *Stanford & Cochran,* for plaintiff in error.

*Chas. West,* Atty. Gen., *R. E. Gish,* and *J. W. Childers,* Co. Atty., for the State.

DOYLE, J. Plaintiff in error, V. R. Hopkins, hereinafter referred to as the defendant, was convicted of murder in the district court of Okmulgee county on an information filed in said court February 4, 1911, charging him with the murder of Walter Huff, in said county, on or about January 13, 1911, and in accordance with the verdict of the jury was sentenced to imprisonment at hard labor in the state penitentiary for life. The judgment and sentence were entered May 27, 1911.

To reverse the judgment, the defendant prosecuted an appeal by filing in this court, on November 27th, a petition in error with case-made.

The testimony in this case is so voluminous that a full review of the same would require a volume in itself, and would serve no useful purpose. The salient facts, briefly stated, are as follows: The defendant and the deceased, both negroes, had lived in the vicinity of Okmulgee for several years, coming from the same neighborhood in Arkansas, and had been friends before coming to Oklahoma. They were both farmers; the defendant living on a rented place about one-half mile west of Okmulgee. Some few months prior to the tragedy, they had a difficulty and the defendant had sworn out a warrant for the de-

ceased. The latter was arrested and had been in jail for some time prior to the 13th day of January, 1911. He was released upon bond on the afternoon of that fatal day, and had started to walk from Okmulgee to the home of Jeff Hopkins, who lived some six miles northwest of Okmulgee. The defendant was in Okmulgee that same day and talked to several witnesses about the prospect of the deceased being released from jail, and said to several persons who were witnesses, that "they had better keep him in jail; that there would be something doing if he got out." One witness suggested to the defendant that he had better not start any trouble, to which the latter replied, "You wait and see," or words to that effect. Shortly after the defendant was informed of the release of the deceased, he went to a hardware store and there asked for buckshot shells and purchased two, which were all they had in stock of that kind. He also purchased five BB shot shells for a 12-gauge shotgun, which were taken out of a fresh box. Later that afternoon the defendant was seen with a Winchester shotgun walking west from Okmulgee in the general direction of where the homicide occurred. On his way to their home, the deceased was overtaken by Jeff Hopkins and his wife. This party of three were seen by several witnesses going slowly along the road about sundown; the deceased walking by the side of the buggy. They went by the place of one witness D. Williams just before entering the road which runs through the woods along by what is called Checotah Lake. Soon after they entered this road by the lake and became lost to sight among the trees, this witness heard several gunshots in rapid succession, then after a considerable pause two more, another pause, and one last shot. Hastening to the scene, he found in order a woman's glove, a buggy whip, an overcoat, and further up the road the dead body of Walter Huff.

Jeff and Lela Hopkins testified that the defendant opened fire on them from behind a large tree a short distance to the right of the road. At the first shot the deceased said, "Hold up there," evidently thinking it was accidental. The defend-

ant stepped from behind the tree, ejected a shell, and continued to shoot. The second shot struck Lela Hopkins in the head and she fell out of the buggy. The third or fourth shot struck Jeff Hopkins, and he tumbled out and crawled into the brush. The deceased ran up the road, pursued by the defendant, who passed the buggy, shooting as he went. The defendant was recognized and positively identified by Jeff and Lela Hopkins; they having known him for a long time. The body of the deceased was riddled with BB shot and buck-shot. Several empty shells were picked up at the foot of the tree near the road, and shot were found in trees across the road from this tree. This shot, the empty shells, the defendant's gun, and the box of shells from which he bought the five were all in evidence, and the jury had full opportunity to compare all these things with one another, and with the account of the wounds made and the kind of shot found in the wounds.

The defense was an alibi. Living with the defendant at the time was a boy by the name of M. C. Porter. The defendant admits that early in the day he and this boy went west from their home down to a small lake to shoot fish, but that they returned before 5 o'clock in the afternoon. The defendant lived at the time on land owned by one James Thomas. The defendant had been in Okmulgee on the day of the killing, and had learned that the deceased was about to be released from jail; he asked James Thomas to find out for sure for him whether Walter Huff got out of jail, and said that he would come to his house and inquire. On the evening of January 13th, and about the hour of 6 or 6:30, the defendant and the boy M. C. Porter appeared at the James Thomas home, and the defendant made inquiry in regard to the deceased getting out of jail. Being informed by Thomas that he was out of jail, the defendant called up a grocery store in Okmulgee, run by a negro, and tried to find out who it was that went on the bond of the deceased. There is some conflict in the testimony as to the time the defendant and the boy reached the

Thomas place, which is about four miles from the scene of the crime.

Several witnesses for the defense swore that the defendant and the boy were at their home and feeding hogs at practically the same time that Walter Huff was killed. These witnesses are all negroes. Just a little to the southwest of where the defendant lived at the time, a white man by the name of C. R. Long lived. A person standing at the home of this man Long could plainly see the house and the barn where the defendant lived.

The petition in this case covers 27 pages and contains 30 assignments of error, only a few of which we deem necessary to specifically consider.

The first alleged error is that the trial court abused its discretion in denying the application for a continuance. In the affidavit for continuance the defendant stated that C. R. Long, who resided at Rolfe, Mo., is a material witness, and, if present, would testify that on the day of the killing the defendant was at his own home at the time the killing is alleged to have taken place; that defendant has only been recently released from jail; that he has used every possible effort to locate said witness and he has only been able to locate said witness in the past few days; that immediately he caused his attorney to see said witness and he (the said C. R. Long) has promised to be present at the next term of this court and testify; and that he believes the testimony so to be given to be true. Evidently the trial court was satisfied that due diligence was not shown, and the absent witness' promise to be present at the next term of court was simply a subterfuge to secure a continuance. If the defendant had exercised due diligence, he could have procured the deposition of this nonresident witness under the provisions of article 17, Procedure Criminal. The application lacks the evidence of good faith, as well as that of due diligence.

Second. That the court erred in sustaining a challenge for cause by the state to a juror, who on his *voir dire* stated that

he had conscientious scruples against the infliction of the death penalty, and that he could not conscientiously agree to a verdict which should fix that punishment.

It is insisted that section 2275 of Comp. Laws 1909, providing:

"Every person convicted of murder shall suffer death, or imprisonment at hard labor in the state penitentiary for life at the discretion of the jury. Upon trial of an indictment for murder, the jury, if they find the defendant guilty, must designate in their verdict whether he shall be punished by death or imprisonment for life at hard labor, and the judgment of the court shall be in accordance therewith. But upon a plea of guilty the court shall determine the same"

—has been repealed by implication by the enactment of section 2028, providing:

"In all cases of a verdict of conviction for any offense against any of the laws of the state of Oklahoma, the jury may, and shall upon the request of the defendant, assess and declare the punishment in their verdict and the court shall render a judgment according to such verdict, except as hereinafter provided"

—and that, unless there is a special request by the defendant in a murder case that the jury do fix the punishment it is permissible for the jury, if they find the defendant guilty of murder, to leave the punishment to be fixed by the court. And therefore the defendant was denied the right of having a jury selected in conformity with the law. The jury selected imposed the lighter punishment, and for this reason the ruling of the court is not open to review. However, as there seems to be some misapprehension of the respective sections prevalent, we will briefly state our views on the question.

Section 2275 authorizes the penalty of death at the discretion of the jury, and, if they find the defendant guilty of murder, they must designate in their verdict whether he shall be punished by death or imprisonment for life at hard labor; and, when a plea of not guilty is entered to an indictment or information charging murder, the extreme penalty can be adjudged only upon the verdict of a jury fixing the punishment

by death. In such cases the general provisions of section 2028 and section 2029 of the Penal Code have no application, only "upon a plea of guilty the court shall determine the same." *Opinion of the Judges,* 6 Okla. Cr. 18, 115 Pac. 1028.

Subdivision 8 of section 6812, Comp. Laws 1909, provides that:

"(8) If the offense charged be punishable with death, the entertaining of such conscientious opinions as would preclude his finding the defendant guilty of, in which case he shall neither be permitted nor compelled to serve as a juror."

Under the law the challenge to the juror was properly sustained.

Numerous exceptions were taken to the rulings of the court on the rejection and admission of testimony. Among these may be noticed the following: On the cross-examination of the state's witness Jeff Hopkins the court sustained objections to various questions as to whether he (the said Hopkins) had in fact held himself out to be a hoodoo doctor, and in excluding the testimony of Mrs. Lou Allen and Ed Love, offered by the defendant to prove that the witness Jeff Hopkins had been holding himself out as a hoodoo doctor. We think this evidence was properly excluded. The witness Hopkins' identification of the defendant was only remotely affected one way or another, if at all, by evidence that he held himself out to be a hoodoo doctor, whatever that is. But we suppose they had in mind the practice of the art of voodooism. There was therefore no logical relevancy in the evidence offered; and, had it been admitted, the court would have been led into the trial of other issues not germane to the principal one, such as what the beliefs of a witness are, and whether or not they are so unreasonable in themselves as to show general lack of mental balance, and a host of collateral matters that would not tend to show whether or not witness saw and recognized the defendant at the time of the tragedy.

It also appears from the examination of this witness that he said he was not a hoodoo doctor and did not pretend to be

at any time. As to what is the proper practice on cross-examination of witnesses the general rule is that the party cross-examining should be confined to the matters concerning which the witness has been examined in chief; but this rule should be liberally construed so as to permit any question to be asked on cross-examination which reasonably tends to explain, contradict, or discredit any testimony given by the witness in chief, or to test his accuracy, memory, veracity, character, or credibility. This must necessarily include impeaching questions, although they may relate to matters independent of the questions testified to in chief.

When the cross-examination is directed to matters not inquired about in the principal examination, its course and extent are very largely subject to the control of the court in the exercise of a sound discretion; and, unless it affirmatively appears that this discretion was abused, the rulings of the trial court will not be reviewed on appeal. *Harrold v. Territory,* 18 Okla. 395, 89 Pac. 202, 10 L. R. A. (N. S.) 604, 11 Ann. Cas. 818; *Rogers v. State,* 8 Okla. Cr. 226, 127 Pac. 365.

The record discloses that, to establish an alibi, the defendant and several witnesses testified that on the evening of the tragedy the defendant came to the house of James Thomas, a distance of three or four miles from the scene of the crime, and while there engaged in telephone conversations with Isaac Lewis and Berry House, who were at a grocery store in Okmulgee, and the defendant offered to prove by himself and various other witnesses the telephone conversations which he then had were inquiries with reference to whether or not the deceased, Walter Huff, who had been confined in the county jail upon a charge of assault with intent to kill upon the person of the defendant, had been released from custody that day. Exceptions were taken to the refusal of the court to permit those conversations to be received in evidence. It is insisted that whatever is said during the period of the alibi is a part of the *res gestae.*

As we view the record, this was an attempt to introduce

mere self-serving declarations made to third parties by the defendant at a place distant from where the killing occurred, and not shown to be under the stress of emotion or uncontrollable impulse. None of the essentials of matter constituting a part of the *res gestae* are shown. While the defendant may prove he conversed with persons who were at the place he claims to have been, he cannot introduce telephone conversations then had, which on his part appear to be nothing more than mere self-serving declarations. The objections were therefore properly sustained.

After a careful examination of the exceptions taken to the rulings of the court, on the rejection and admission of testimony, and of the various questions raised thereby, we are satisfied that, within well-settled rules sustained and upheld by the decisions of this court, no error was committed by the court in any of its rulings.

Several assignments are to the effect that the court erred in permitting the county attorney to make misstatements of the evidence, and statements not warranted by the evidence, prejudicial to the defendant in his closing argument of the case to the jury. And the record contains several excerpts from the argument; the two most severely criticised are as follows:

"There is no question in the world but that the man who bought those shells over there at Parkinson & Trent's store, wrapped up in the paper as they were which was found out there, was the man who shot and killed Walter Huff."

And:

"I say that I have a right to say that on that day as this man and wife, while riding along the road, this defendant, an assassin, stepped from behind a tree and began shooting at them and that he shot Walter Huff."

To which language the defendant duly excepted and requested the court to instruct the jury to disregard such statements, which request the court refused.

The record shows that counsel for the defendant also gave his own version of what the testimony was, and in each in-

stance the difference was simply what the testimony was. The court specifically instructed the jury as follows:

"The jury are the judges of the testimony in this case. They remember the testimony. They will disregard everything but the testimony given."

And the county attorney said to the jury:

"Each of you men have heard the evidence. You remember whether or not any such evidence was given. You are to be governed by it; and not by what I say."

In the face of these statements to the jury, both by the court and the county attorney, taken in connection with the interruptive denials and interjections of counsel for the defendant, we do not think the jury could have been misled as to the facts in evidence. In fact, we doubt that the county attorney went beyond the limits of legitimate argument in the statements criticised.

In one of its instructions the court told the jury that they might disregard the whole of the evidence of a witness who they believed had willfully sworn falsely to any material fact in the case. It is insisted that the giving of this instruction constituted reversible error. In *Manning v. State,* 7 Okla. Cr. 367, 123 Pac. 1029, this court has limited to proper cases the doctrine stated in the early case of, *Henry v. State,* 6 Okla. Cr. 430, 119 Pac. 278. The inability of the defendant's learned counsel to point out specifically any state of facts in this case that tend to show that the defendant was prejudiced thereby is sufficient to confirm our conclusion that the giving of this instruction does not necessarily constitute reversible error. This was the only instruction given that is criticised in the brief. Error is assigned upon the refusal of the court to give certain instructions requested, but this assignment is not supported by citation of authority; and, under the rulings of this court that where the instructions given, considered as a whole, fully and fairly state the law of the case, such alleged errors, unsupported by citation of authority, will not be considered.

On page 634 the record recites that, over the objection of the defendant, the court permitted the jury to take with them to the jury room the shotgun, the shells, and the shot which had been offered in evidence. This action of the court, the final matter of alleged error, presents the most serious question in the case. The defendant's counsel contends that this error alone entitles the defendant to a reversal of the case, and in support of his contention confidently cites the case of *Hansing v. Territory*, 4 Okla. 443, 46 Pac. 509. The statute (section 6864, Comp. Laws 1909, [sec. 5912, Rev. Laws]) provides:

"On retiring for deliberation the jury may take with them the written instructions given by the court; the forms of verdict approved by the court, and all papers which have been received as evidence in the case, or copies of such parts of public records or private documents as ought not, in the opinion of the court, to be taken from the person having them in possession."

In the Hansing Case this section is construed; and it is held that this being the only statutory provision upon this subject, it was error to permit the jury to take with them to their room the firearms used by the two defendants and the hat worn by the deceased at the time of the affray. Mr. Justice Scott, who delivered the opinion of the court, said:

"It appears that in this case the evidence is very. conflicting. * * * It appears by the testimony of two of the jurors that the jury, after retiring, in the defendant's absence, made a number of experiments with the gun and hat, for the purpose of testing the accuracy of the testimony of the different witnesses on that point, showing that the jury received light to enable them to reach a conclusion from a foreign and forbidden source."

In the case of *State v. Crea*, 10 Idaho, 88, 76 Pac. 1013, the Hansing Case is quoted with approval. In the case of *Kennon v. Territory*, 5 Okla. 685, 50 Pac. 172, the doctrine of the Hansing Case is somewhat modified. In *Saunders v. State*, 4 Okla. Cr. 264, 111 Pac. 965, Ann. Cas. 1912B, 766, it was held proper for the jury to take, on retirement, the coat worn by deceased when he was shot, which was introduced in evidence;

counsel for the defendant stating that he had no objection thereto.

We think that articles which have been received in evidence are not "papers" in the sense of the statute; and the practice of permitting the jury to take to the jury room such articles or exhibits, unless the defendant consents, is of doubtful propriety. However, where it does not appear that they were used or handled by the jurors in a manner not consistent with the evidence, it does not constitute error.

The Supreme Court of Washington, in passing upon this point under a statute similar to ours, in the case of *State v. Webster,* 21 Wash. 63, 57 Pac. 361, says:

"The objection of counsel is met by the very well-considered case of *Doctor Jack v. Territory,* 2 Wash. T. 101, 3 Pac. 832, in which the above section, which has been the existing law of the state and territory for many years, is construed. There it was held that exhibits properly introduced in evidence, and explanatory of the evidence of witness, might be taken to the jury room (in that case, which was a conviction for murder in the first degree, a hat and coat, which were exhibits in the case, were taken to the jury room); and such has been the practice and the accepted construction of this section since then."

In *Spencer v. State,* 34 Tex. Cr. R. 238, 30 S. W. 46, 32 S. W. 690, on a trial for murder, after the jury had retired to consider of their verdict, the clothing of deceased, which had been put in evidence, was, on application of the jury, authorized by the court to be sent to them in the absence of and without the knowledge of defendant and his counsel. The Court of Criminal Appeals held that this was not error. In *Chalk v. State,* 35 Tex. Cr. R. 116, 32 S. W. 534, the same court held that:

"It is not error to authorize the carrying of deceased's coat, which had been used in evidence, into the jury room."

In *Ferguson v. State,* 61 Tex. Cr. R. 152, 136 S. W. 465, the same court reaffirmed this doctrine.

The Supreme Court of Arkansas has held that it was within the discretion of the court to permit the jury to take a

forged time check to their jury room for further inspection during their deliberations. *Harshaw v. State,* 94 Ark. 343, 127 S. W. 745.

The Supreme Court of Iowa, in a homicide case, held that, where decedent's skull was admitted in evidence, the jury were properly permitted to take it to the jury room. *State v. Teale,* 135 N. W. 408.

The Supreme Court of Illinois, in *McCoy v. People,* 175 Ill. 224, 51 N. E. 777, held it was proper for the jury to take, on retirement, the · bullet removed from the body of the deceased, and the revolver belonging to the accused, where both had been admitted in evidence. And in the case of *People v. Morris,* 254 Ill. 559, 98 N. E. 975, the same court held that it is proper, in a prosecution for homicide, to. send to the jury room objects which have been introduced in evidence, which are or may be of assistance to the jury in illustrating or elucidating some controverted question involved in the evidence, and that this is a matter wholly within the sound discretion of the court, the exercise of which will not be interfered with without an affirmative showing that the discretion was abused. See, also, *State v. Stebbins,* 29 Conn. 463, 79 Am. Dec. 223; *State v. McCafferty,* 63 Me. 223; *Powell v. State,* 61 Miss. 319; *Taylor v. Commonwealth,* 90 Va. 109, 17 S. E. 812.

Section 6896, Comp. Laws 1909, (Rev. Laws, sec. 5937), provides

"A court in which. a. trial has been had upon an issue of fact has power to grant a new trial when a verdict has been rendered against a defendant by which his substantial rights have been prejudiced, upon his application in the following cases only: * * * Second. When the jury has received any evidence out of court, other than that resulting from a view of the premises. Third. When the jury * * * has been guilty of any misconduct by which a fair and due consideration of the case has been prevented."

In the case at bar it cannot be said that the jury received evidence out of court. These articles had been properly identified and received as evidence in the case. Nor can it be said that the jury was guilty of misconduct, such as

prevented a fair and due consideration of the case, for them to take with them these articles. No injury is pointed out, and no prejudice to the substantial rights of the defendant appears; and we are of opinion that in the case at bar there was no error in that regard. In so far as the case of *Hansing v. Territory, supra,* conflicts with this opinion, it is overruled.

The importance of the question in our practice must justify the attention here given to it; and we feel constrained to enunciate, as a general rule, that, where the jury in open court request permission to take with them to the jury room, to inspect during their deliberations, articles introduced in evidence, the granting or refusal of the request is within the discretion of the trial court, but, if the defendant consents, the request should be granted. The practice at best is not a safe one, as cases might arise where the jury during its deliberations might use, or attempt experiments in a manner not consistent with the evidence; and it is strongly urged upon trial courts to avoid possible prejudicial error by refusing such requests, except in cases where the trial court is convinced that an inspection of such articles may be of assistance to the jury in considering some controverted question involved in the evidence.

While we agree that some irregularities intervened during the progress of the trial of this case, as herein indicated, we regard these irregularities as not having probably had any perceptible effect upon the result of the trial, and our conclusion is that no error has been committed to the prejudice of the defendant. In our opinion, the evidence in the case shows, beyond any character of doubt, that this defendant committed a cold-blooded assassination by lying in wait by the wayside and shooting a defenseless neighbor.

The judgment of conviction is affirmed.

ARMSTRONG, P. J., and FURMAN, J., concur.