Donald Leon FARMER, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. A–16616.

Court of Criminal Appeals of Oklahoma.

March 8, 1973.

Rehearing Denied April 5, 1973.

Frasier & Frasier, Tulsa, for appellant.

Larry Derryberry, Atty. Gen., Paul Ferguson, Asst. Atty. Gen., for appellee.

## OPINION

BLISS, Presiding Judge:

Appellant, Donald Leon Farmer, hereinafter referred to as defendant, was charged, tried and convicted in the District

Court of Tulsa County, Oklahoma, for the offense of Robbery With Firearms, Case No. CRF–70–516. His punishment was fixed at ten (10) years imprisonment under the direction and control of the State Department of Corrections, and from said judgment and sentence, a timely appeal has been perfected to this Court.

About 7:30 p.m. on January 22, 1970, the Safeway store at South Denver and 11th Streets in Tulsa, Oklahoma, was robbed by two men. While one man robbed the cashier at check-out stand number five, the other man robbed the main cashier, taking an undetermined amount of cash. They escaped in an automobile belonging to one of the store employees. Two months later, on March 17, 1970, the defendant entered the Safeway store for the purpose of buying a money order, at which time one of the female employees allegedly recognized defendant as being the man who had committed the robbery on January 22nd. The police were called, defendant was arrested, later stood trial and was subsequently convicted.

When the robbery occurred, Sandra Goodman was the cashier at check-out stand number five. She related that a man with a "shaggy looking mustache" stuck a pistol in the back of one of the customers and said, "Sack up the money." So, she totaled up the register and commenced sacking up the money. The man said, "Hurry it up," so she put all the bills in the sack and handed it to him. She described the pistol saying, "Well, it was a short black hand pistol, approximately .22, .25 caliber." She identified the defendant in court as being the man with the pistol and said the difference in his appearance was that he was wearing a mustache on the night of the robbery. She said that after she gave the man the money he went out the door with the customer, but the customer returned into the store. She related that the police arrived and "started taking fingerprints and asking me questions."

The prosecutor then inquired of the witness, "Did you ever see this man again after the night of January 22nd?" She answered, "Yes, sir." She could not recall the date when she saw the man again until she was prompted by the prosecutor. The witness was then permitted to tell, over defendant's objections, about defendant's entry into the store on March 17th and what transpired. She also related how she went to the back of the store and had Tommy Kinnan "come up and take a look at this guy." The prosecutor asked the witness, "Is it the same person you have identified in the courtroom today sitting in the black suit over there?" She replied, "Yes, sir."

On cross-examination, Sandra Goodman said she had worked for Safeway since the previous November 18th, or about two months. She described the robber in the following manner: "He was—he was wearing a gold coat, as far as I could see, because the conveyor belt cuts the vision in half. . . . He had a mustache, auburn hair." She related that the man had a hood over his head, and that the coat had a hood on it, which was up over his head. She said that on March 17th, "He was in this gold coat." She could not say whether or not it was the identical coat but said that it appeared to be the same coat.

On redirect examination, the prosecution went into the special training Safeway employees receive in their program to identify robbers. In this connection, Sandra Goodman stated as follows: "We have always been told, if we have time or if possible to remember facial description." The defendant objected to this line of questioning, but his objection was overruled. When the court advised the witness she could stand aside, the defense counsel asked: "May I inquire?" The court answered: "No, not unless there's some new matter been raised and he hadn't raised anything that I know of." Defendant took exceptions to the ruling. This is the basis for defendant's first proposition.

Nancy Bricky testified concerning the robbery of the main cashier's booth on January 22, 1970. This testimony was admitted as being part of the res gestae.

Thomas D. Kinnan was an employee of the store who had returned about 7:30 p.m. for certain union papers and left his automobile outside the store with the engine running. He testified that as he was leaving the store he was approached by two men with guns who pointed to an Oldsmobile and asked if that was his car. He said no and turned and ran back into the store. He related that he saw the two robberies and identified the defendant in court as being the man at check-out stand number five. He told how the two men first tried, without success, to get into a blue Plymouth and then went to his Javelin automobile, in which they made their escape.

The prosecutor asked Mr. Kinnan, "Now, did you ever see the man who you have described as robbing Sandra Goodman again after that night?" The witness answered, "Yes, sir." Mr. Kinnan then went into the details of the March 17th encounter with the defendant. Defendant's objection that the testimony was hearsay was overruled. The witness described the difference between defendant's appearance at trial with that of the robber by saying, "He had a mustache and his sideburns are shorter." He was asked, "Was there anything unusual about the mustache?". The witness replied, "Yes, sir. It—oh, you know, looked like peach fuzz; didn't look real. It was just a little bit there." The witness related the difference at trial was that defendant had no mustache.

On cross-examination, Mr. Kinnan described the two robbers, stating as follows: "Well, one of them was in sort of a sport coat, dark; had black glasses. The other one was in a brownish colored jacket with a hood." He related that the hood was tied up; that he could see all the face; that he could barely see the hairline; and that the mustache was real short, "like he had just started growing it or something." He related that his encounter with the men at the store entrance was from "three to five minutes." At this point the court properly sustained the prosecutor's objection that counsel was becoming argumentative with the witness. When defense counsel asked, with reference to his March 17th encounter with defendant, "And how was he dressed when you saw him again?", he replied, "Still had the same coat on." Counsel asked, "The identical coat?", and the witness said, "Yes, sir."

Mr. Lewis Culver was the customer held at gunpoint during the robbery. On direct examination he could not identify the defendant as being the robber, except to say that he was the same general build. On cross-examination, this witness related that he got a good look at the robber, who wore a coat with a hood up over his head; that he could only see a little bit of his hair; and that the man had a mustache that "looked like it was maybe two or three weeks growth, sort of reddish or blonde—I don't know what color you would call it—but light."

Mrs. Elizabeth Pape, a store customer, encountered the two men as she was entering the store and they were leaving. After she entered the store, the two men re-entered and demanded that she go with them, but she refused. She identified the defendant in court as being one of the two men. She described the robber as being rather short, blue-eyed, light complexioned and that at the time of the robbery he had a mustache. On cross-examination, this witness could not say whether or not the man wore a hood; and in answer to defense counsel's question, she said, "All I know, Mr. Frasier, was his head—his hair was covered." At the conclusion of her testimony, the State rested its case.

Defendant, a young Viet Nam war veteran, testified in his own behalf and offered the defense of alibi. He related that on the night of January 22nd, he was at home with his wife and small child watching television; and that he had been in the

Safeway store numerous times since January 22nd and offered two Safeway register tapes and a money order stub in an effort to prove that fact. He testified that he worked at Black, Sivalls and Bryson. On the afternoon in question, he got off work a little before 5:00, went to his apartment, watched television and tended his three-year-old daughter in her play-pen until about 8:30 p. m., when he went to the Safeway store for several items of groceries for breakfast. He said he remembered the day because on January 21st the telephone was installed in his apartment. He testified that he had never worn a mustache and that he did not commit the robbery as alleged. While he and his wife were visiting his mother-in-law on the day following the robbery, his father-in-law showed him a newspaper relating the robbery on January 22nd and he commented he had been there about 8:30 that evening. Defendant testified that on February 12th he was at the Safeway store, sitting in his car in the parking lot, when he observed a black Chevrolet back into a new looking Mustang. He wrote down the Chevrolet license tag and when Mr. Raynolds, the owner of the Mustang, came out, he gave the man the license number of the car that damaged the Mustang. He testified that he was in the store again on February 13th, seeking a valentine for his wife, and again on March 2nd and 5th, which he attempted to prove by two of the cash register slips. He related that on March 17th he stopped on his way home at the Safeway store to purchase a money order and some cokes. While he was buying the money order, this lady looked over the partition at him for about five seconds and he looked at her. She jumped down, and had a couple of words with the man in the booth. He said he didn't think anything of it and went to get his cokes. A few minutes later, he was arrested by a detective. He testified that he had been in Tulsa since March 28, 1969, when he was discharged from the Navy. Defendant offered into evidence the coat he was wearing when he was arrested, because it was

largely by identification of the coat that two of the witnesses allegedly identified him on March 17th as the robber. The coat did not have a hood on it.

On cross-examination, defendant admitted that he did not have all the cash register tickets, but his wife did find those he introduced into evidence to show he had been in the store since the robbery. He testified that he could not remember whether or not he wore the coat into the store at 8:30 on the evening of January 22nd when he purchased the groceries for breakfast, but he usually had it in the car on cool days, and that he saw no police cars and nothing unusual at the store when he arrived that night. He said that he had a .22 rifle and a 12-gauge shotgun, but he did not own a hand gun of any kind. The prosecutor showed the defendant a pellet gun that shoots "BB's" and asked him if he had ever shot one. Defendant admitted that his nephew in Durant, Oklahoma, had one that he had shot. How the pellet gun came into the trial is not shown by the record.

Defendant's wife testified and related that her husband arrived home between 5:45 and 6:00 p. m. on the evening of January 22, 1970, and that they had supper and watched television. About 8:30 her husband went to the Safeway store for some items for breakfast. She related that she and her husband were the only persons who purchase groceries, and that she could identify the tickets introduced into evidence by the item costs on the ticket. She identified one of the tickets by the cost for five cokes and a TV Guide her husband purchased. She admitted talking with Officer Putnam on the day following her husband's arrest, in the police station and later in the courthouse. She denied that she told the officer that her husband arrived home about 8:30 the evening of January 22nd, but she said she was distraught and wasn't certain what she might have told him.

Mr. Robert Raynolds, a Tulsa attorney, testified and verified defendant's story

concerning the accident in the parking lot on February 12th, and said that defendant gave him the license number of the other car, his own name, and where he could be located. On cross-examination, Mr. Raynolds admitted he did not see the defendant in the store. The defendant rested his case, and the State called a rebuttal witness.

Officer Bill Putnam was called and testified that he did talk to defendant's wife on the day following her husband's arrest, and that she said defendant got off work about 8:15 or 8:30 p. m. on January 22nd. Officer Putnam described Mrs. Farmer's condition at the time he talked with her in the detective squad room as follows: "She was just normal; I would describe her condition as just normal." On cross-examination, the officer could not recall whether or not he talked with Mrs. Farmer in the courthouse, but said she was alone when he talked with her in the squad room the first time and that she was upset at her husband's arrest, but the second time she was not alone and she was not upset, at least she was not crying.

■ In his brief, defendant argues his appeal under five propositions. The first asserts that the trial court committed reversible error when he denied defense counsel the right of re-cross examination of Witness Sandra Goodman; and that his cross-examination of Thomas Kinnan was severely curtailed.

In the case of Igo v. State, Okl.Cr., 267 P.2d 1082 (1954), this Court held in the third paragraph of the Syllabus:

"The extent of cross examination with respect to an appropriate subject rests in the sound discretion of the trial court, and it is only in cases of clear abuse of such discretion, resulting in manifest prejudice to the accused, that this court will cause a reversal of the case."

The record reveals the District Attorney, on re-direct examination of Witness Sandra Goodman, went into her training by the Safeway stores as to what to do in the event that she was robbed and this was a new area of examination. Although we believe the better practice would have been to allow defense attorney to re-cross examine this witness, we do not believe the trial court's denial of re-cross examination of this witness was an abuse of discretion. The new matter was clearly a collateral issue and if defense counsel had wished to pursue this issue he could have called this witness as his own. As to Witness Thomas Kinnan, the record reveals that defense counsel had become argumentative with this witness and the trial court rightly curtailed the cross-examination of this witness.

We, therefore, find no merit in defendant's first proposition.

■ Defendant's second proposition asserts it was reversible error for the trial court to admit in evidence the testimony of Officer Putnam concerning the conversation between the defendant's wife and Officer Putnam which occurred at the police station the day following the arrest of the defendant.

The record reveals that defendant's wife, on direct examination, testified that her husband arrived home from work on the night of the robbery between 5:45 and 5:55 p. m. Officer Putnam was called in rebuttal by the State and testified the defendant's wife stated to him, the day following defendant's arrest, that the defendant did not get off work until approximately 8:15 or 8:30 p. m. We believe that Officer Putnam's testimony was proper evidence for impeachment purposes. See Kizer v. State, Okl.Cr., 468 P.2d 56 (1970). We further note defendant did not object to Officer Putnam's testimony. We, therefore, find no merit in this proposition.

■ Under defendant's third proposition he asserts: "It was reversible error for the court to permit two state witnesses to relate to the jury as original testimony extra judicial identification of the defendant as the robber and this error was further compounded by permitting the state to offer as original testimony hearsay conversations between the witnesses concerning

their identification of the defendant." In this proposition, the defendant cites the testimony of Witnesses Sandra Goodman and Tommy Kinnan which was offered as direct evidence concerning the identification of the defendant when he entered the store on March 17th.

The record reveals that prior to any of the complained of testimony relating to the identification of the defendant on March 17th, both witnesses identified the defendant in court based upon the appearance of the defendant at the scene of the robbery. We, therefore, find no merit in this proposition. See Hill v. State, Okl.Cr., 500 P.2d 1075 (1972).

Defendant's fourth proposition asserts: "The trial court made observations from the bench, assisted the state in the presentation of the case, and commented on the evidence in the presence of the jury to such point that the defendant was deprived of the fair and impartial trial to which he was entitled." In the case of Stacey v. State, 79 Okl.Cr. 417, 155 P.2d 736 (1945), this Court held in the tenth paragraph of the Syllabus:

"Where it is contended that trial court continually interrupted the examination of witness by counsel for defendant with statements which prejudiced the defendant, the entire record will be considered to determine whether the statements complained of were so grossly improper as to prevent the accused from having a fair trial."

We have examined the entire record and are of the opinion that the complained of statements made by the trial court were not so grossly improper as to prevent the defendant from having a fair trial.

Defendant's last proposition asserts: "The cumulative effect produced by the repeated admission of incompetent, immaterial and irrelevant evidence was in its totality enough to deny the defendant the fair trial to which he was entitled." The defendant cites no authority in support of this proposition. This Court has repeatedly held:

" 'It is necessary for counsel for plaintiff in error not only to assert error, but to support his contentions by both argument and the citations of authorities. Where this is not done, and it is apparent that the defendant has been deprived of no fundamental rights, this court will not search the books for authorities to support the mere assertion that the trial court has erred.' See: Collins v. State, Okl.Cr., 407 P.2d 609." Sandefur v. State, Okl.Cr., 461 P.2d 954 (1969).

Therefore, having considered the briefs and records before this Court and finding the defendant was not deprived of any fundamental right, we are of the opinion the judgment and sentence herein should be, and the same is hereby, Affirmed.

We note from the record that defendant has been out on bail pending this appeal since December of 1970 and that the defendant has no prior conviction. We, therefore, direct the defendant and his attorney's attention to 22 O.S.1971, § 994. Affirmed.

BUSSEY, J., concurs.

BRETT, J., concurs in part, dissents in part.

BRETT, Judge (concurring in part, and dissenting in part).

I readily concur in that part of this decision which directs defendant and his attorney to the provisions of 22 O.S.1971, § 994, concerning consideration for a suspended sentence; but I respectfully dissent to the results reached by the majority decision. I believe the conviction should be reversed and remanded for a new trial.

The majority decision cites Igo v. State, supra, to support the trial judge's action in cutting off defendant's cross-examination of the principal witness and states, the extent of cross-examination "rests in the sound discretion of the trial court, and it is only in cases of clear abuse of such discretion, resulting in manifest prejudice to the accused, that this court will cause a rever-

sal of the case." Ironically, in the Igo case this Court said in the dictum of the decision, prior to stating the rule, "The court permitted the prosecution possibly too much latitude, even though the procedure by defense counsel may have enticed the questioning by the prosecution." 267 P.2d at page 1096. In the instant case, however, there was no enticement on defendant's part. Instead, the prosecution was attempting to correct witness Sandra Goodman's testimony concerning her identification of the coat defendant was wearing. The witness had testified on direct examination that the coat defendant was wearing on the night he was arrested was the same coat he was wearing when he allegedly robbed the grocery store; but, when defendant offered the coat into evidence, there was no hood on the coat. Consequently, on re-direct, the prosecution went into the identification training the witness received when she started working for the store some two months earlier. When defense counsel requested to enter recross examination of the witness, the trial court refused defendant's request and excused the witness. Defendant preserved his exceptions to the court's ruling. I believe such action was an abuse of judicial discretion insofar as this witness was the principal witness, and she was one of the positive identifying witnesses.

In Hopkins v. State, 9 Okl.Cr. 104, 130 P. 1101 (1913), one of the leading State cases on the subject of cross-examination, this Court said:

"As to what is the proper practice on cross-examination of witnesses the general rule is that the party cross-examining should be confined to the matters concerning which the witness has been examined in chief; *but this rule should be liberally construed* so as to permit any question to be asked on cross-examination which reasonably tends to explain, contradict, or discredit any testimony given by the witness in chief, or to test his accuracy, memory, veracity, character, or credibility. *This must necessarily* include impeaching questions, although they may relate to matters independent of the questions testified to in chief.

"When the cross-examination is directed to matters not inquired about in the principal examination, its course and extent are very largely subject to the control of the court in the exercise of a sound discretion; and, unless it affirmatively appears that this discretion was abused, the *rulings of the trial court will not be reviewed on appeal.*" (Emphasis added)

In the instant case the general rule was not liberally construed; and, who is now to say whether or not defendant could have sufficiently challenged the witness' identification, because he was not permitted to make that attempt. The witness testified that she had worked for the Safeway Stores about two months and nothing in the record reflects that she made any observations about the robber, except for his coat, hood and mustache—in other words, his general appearance. There is no doubt in this writer's mind, but that the trial judge did abuse his discretion when he denied defendant the right to further cross-examination of Sandra Goodman, who was the principal witness against defendant. Considering the facts of this case, when this Court says, as the majority opinion recites, "Although we believe the better practice would have been to allow defense attorney to re-cross examine this witness, we do not believe the trial court's denial of re-cross examination of this witness was an abuse of discretion. . . .," this Court is protecting the trial judge's ruling at defendant's expense. Certainly defendant could have called the witness as his own witness, but direct examination is not nearly as effective as cross-examination in such instances. This is the first time this defendant has been charged with any crime, and now he faces ten years imprisonment. No doubt should remain concerning either his guilt, or whether or not he received a fair trial. If the trial judge committed error, which I believe he did, this Court should recognize it and grant defendant a new trial.

As I view the record, the identification of defendant was not as clear-cut as the majority decision leaves one to believe. Notwithstanding the fact that the extra-judicial identification statements of the two witnesses are now considered to be admissible, on March 17th, when defendant was arrested, witness Sandra Goodman talked Thomas Kinnan into believing defendant was the man who robbed the store; and then when Goodman's testimony became suspect, defense counsel was denied further cross-examination. The third identifying witness saw the two robbers only briefly, and some nine months later identified defendant as one of the robbers. But Mr. Lewis Culver, who observed the robber longer than any other witness, and who was the customer in whose back the robber held a pistol, when asked if he saw the robber in the courtroom testified, "Well, I see someone with the same general build; that's all I can say." He refused to identify defendant as the man who robbed the store.

Defendant complains also that the trial judge interposed statements when questions were asked, and made observations from the bench which were prejudicial to defendant. I believe defendant's contentions contain merit. The prosecutor was questioning Nancy Bricky, the other cashier who was robbed by yet another man, at the same time Sandra Goodman was allegedly being robbed by defendant. The prosecutor asked, "And will you describe for us, please, what happened?" Miss Bricky answered, "Well, as I said, this man walked up to the cashier's booth; he said, 'Sack up all the money.'" The prosecutor then said, "Just tell us what happened." Defense counsel objected saying, "Now, I'll object again; this is hearsay." Instead of ruling on defendant's objection, the court stated, "Well, you were ordered to sack up the paper; that's the way to get around it —the money, I mean money." Defense counsel saved his exception.

On numerous other occasions when a question was asked of a witness, the court would interpose "If you know." On another occasion when defense counsel was interrogating witness Thomas Kinnan and asked what defendant was doing when the witness saw him on the night of March 17th, the court interposed, "If you know what he was doing." At one point, when ruling on the prosecutor's objection to defendant's evidence, the court stated, "Well, overruled for whatever it's worth; I don't know."

Such comments are unnecessary and in this case could have had no other effect than to prejudice defendant in the eyes of the jury. "The Constitution provides for a fair and impartial trial. It can be made an unfair and a partial trial by the trial judge in his use of facial gestures or tone of voice, expressions, showing censure or dispargement of counsel or a witness or unnecessary emphasis in his rulings or other remarks." [1] . . . "The influence of the trial judge on the verdict of the jury is so great that no action nor word of the trial judge should be allowed to indicate the judge's conclusion of guilt or innocense." [2]

After carefully reviewing the record of defendant's trial, I do not accept the citation of Sandefur v. State, supra, as being sufficient to cast off defendant's fifth proposition. The State was allowed to introduce various items of irrelevant, incompetent and immaterial evidence and testimony to defendant's prejudice. To me the cumulative effect of that evidence and testimony becomes fundamental and requires no specific citation of authority.

The State was permitted to inquire of defendant concerning his brothers, how many he had, where they lived, and were they in Tulsa on January 22, 1970, leaving the implication that one of them might have been the other robber. On cross-examination of defendant, the State was per-

---

1. Conner, Leslie L., The Trial Judge, His Facial Expressions, Gestures and General Demeanor, OBAJ, vol. 40, p. 961, 1969.

2. Id., p. 965, citing: Veal v. State, 196 Tenn. 443, 268 S.W.2d 345 (1954).

mitted to inquire concerning a "B-B" pellet gun, and introduced one into evidence without showing that it had any bearing on defendant's trial whatsoever. There was no showing that defendant possessed a pistol, and if his apartment was searched, none was found. Defendant denied that he had ever owned a hand-gun of any sort, but did admit having shot such a pellet gun, which belonged to his nephew in Durant, Oklahoma. The only effect such display and interrogation could have had on the jury was a prejudicial effect. The cross-examination of defendant's wife was allowed to go beyond proper limits, as was the rebuttal testimony of Officer Bill Putnam.

I concur that defense counsel should apply to the trial court for suspended sentence under the provisions of 22 O.S.1971, § 994, since the majority of this Court sees fit to affirm this conviction; and I strongly urge the judge who considers such application to suspend defendant's sentence in its entirety. But I respectfully dissent to this Court's action in affirming defendant's conviction, because as I view the record, defendant did not receive that type trial contemplated by due process of law.