## CARL CREEK v. STATE.

No. A-3174.   Opinion Filed Nov. 8, 1919.

(184 Pac. 917.)

1. **WITNESSES—Cross-Examination of Defendant.** It is the established rule in this jurisdiction that a defendant, offering himself as a witness, subjects himself, as regards cross-examination, to all the rules governing other witnesses.

2. **WITNESSES—Scope of Cross-Examination.** The cross-examination of a witness is not to be confined to the particular questions asked, nor the precise subjects called to his attention, on direct examination. The correct rule is to allow the cross-examination to extend to any matter not foreign to the subject-matter of the examination in chief, which tends to limit. explain, or modify the same.

3. **SAME—Cross-Examination of Defendant.** For matters held to be within the legitimate scope of the cross-examination of the defendant, under the issues in this case, see body of opinion.

4 **APPEAL AND ERROR—Review—Requested Instructions—Repetition.** It is not error for the trial court to refuse to give a requested instruction if the principles of law therein contained are covered in the general instructions.

*Appeal from District Court, Okmulgee County;*
*R. P. deGraffenreid, Assigned Judge.*

Carl Creek was convicted of manslaughter in the first degree, his punishment fixed at 15 years' imprisonment in the state penitentiary, and he appeals. Affirmed.

Earl Kelly was shot and killed by Carl Creek at the latter's apartment in the town of Morris, Okmulgee county, Okla., on the 25th day of March, 1916, at about 4 o'clock in the afternoon. The killing was accomplished by means of a 32-caliber automatic pistol, the defendant firing about five shots at the deceased, inflicting mortal wounds on the left side of the body, one of which pene-

trated the abdomen and caused death about three hours after the shooting.

Both defendant and deceased were workers in the oil fields, and had known each other for some time prior to the commission of the homicide.

According to the state's witnesses, in the early afternoon of the 25th of March, 1916, the deceased called defendant by telephone, and advised defendant not to come up town, that the officers would arrest him; also telling the defendant that he would take something down to the defendant's apartment. Thereafter deceased went to defendant's apartment, and was invited in by either Creek or his wife. A short time after the deceased went into the house of defendant, some one was heard to say, according to the testimony of persons who were living in other apartments of the same building, "Now, by God, I've got you," to which the reply was made, "Carl, don't do that; don't do that." Almost immediately thereafter several shots were fired, and Kelly was seen to fall out the front door of Creek's apartment, mortally wounded.

Before his death, Kelly made a number of dying statements, to the effect that Creek had killed him, had called him down to his house, and shot him down like a dog.

There is also evidence on the part of the state's witnesses to the effect that the defendant was drunk at the time of his arrest shortly after the shooting; that he resisted arrest by one officer, and was finally arrested by three other officers and taken to the jail at Okmulgee, Okla. The deceased was unarmed at the time of the shooting, but there is some evidence in the record to the effect that deceased had been drinking some before the shooting,

and carried a flask of whisky with him to the home of the defendant.

The defendant interposed the plea of self-defense, and also that the deceased had been intimate with defendant's wife, which fact had become known to the defendant, having caused previous trouble between him and the deceased, in which the defendant states that the deceased shot at him about the month of December, 1914.

Defendant testified that the deceased came to his house on the afternoon of the killing with a half-pint flask of whisky; that deceased was under the influence of whisky when he arrived, and invited the defendant to drink with him; that the defendant, who was not well at the time, took a sip out of the flask, but that the whisky burned so much that he told deceased he could not drink it. Thereupon defendant's wife offered to make them each a toddy out of the whisky, which was done, and that both drank their toddies. Thereafter deceased followed defendant's wife into a back room, and was seen by the defendant to punch or strike his wife on the hip or leg, and also deceased was heard to remark at the time, "Why haven't you got that big son of a bitch out of here?" Defendant testifies that his wife then returned to the room in which he was resting and asked him to put the deceased out of the house because deceased was intoxicated. Defendant then says that he asked deceased to leave, and that thereupon deceased remarked, "Put me out, you big son of a bitch," at the same time making a motion towards his hip pocket, whereupon the defendant reached under a pillow on his bed, pulled out his pistol, and fired five times in rapid succession at the deceased, four of which shots took effect, resulting in the death of deceased as heretofore detailed.

On direct examination, defendant, when asked why he shot deceased, stated, "Because I thought he had a gun and would kill me; that he had tried it, and thought that he had at one time." On redirect and recross-examination, the following questions were asked and answers made by the defendant:

"By Mr. Eaton: Q. Mr. Creek, at the time you fired at or shot Kelly, what was the condition of your mind as to being worried or not

"Mr. Carter: We object to that as incompetent, irrelevant, and immaterial.

"Q. Over your wife's relation?

"The Court: Why?

"Mr. Carter: Because he has been over that two or three times.

"The Court: I think he may answer that.

"A. Angry.

"Q. Well, in regard to your family troubles? A. Well, sir, when he insulted that woman everything came in front of me just like I had seen it for the past four or five months; the thought that was through my head was that it was either kill him or get killed; that is what I thought, when I shot him.

"By Mr. Eaton: That is all."

Recross-examination:

"By Mr. Carter: Q. Do you know now, Mr. Creek, or can you tell the jury now, whether you shot him because you thought he was going to shoot you, or did you kill him just because you were mad? A. I shot him because I thought he was going to kill me.

"Q. It wasn't over your family troubles at all, then? A. It was over both."

The foregoing excerpts from the defendant's testimony support the theory that he shot and killed the deceased in self-defense, and that, although there had been previous trouble between defendant and deceased because of the belief of the defendant that deceased was intimate with defendant's wife, and such matters flashed as a picture in the mind of the defendant at the time of the killing, the cause that impelled the defendant to fire the shot, according to his own testimony, is the belief that he thought deceased was going to kill him at the time. So that, under the evidence in this case, the issue is clearly defined, the evidence on the part of the state supporting the theory that the homicide was murder, while that of the defendant, although admitting anger on his part, would tend to justify the killing; at least sufficient provocation is shown by defendant's testimony to reduce the degree of homicide to manslaughter in the first degree.

The jury returned a verdict of manslaughter in the first degree, and assessed the punishment at 15 years' imprisonment in the state penitentiary. The court pronounced judgment in accordance with the verdict, from which judgment the defendant has appealed to this court, assigning several grounds of error, which will be discussed in the opinion proper.

*Joe S. Eaton* and *John Caruthers,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *W. C. Hall,* Asst. Atty. Gen., for the State.

MATSON, J. (after stating the facts as above.) The first alleged error relied upon for a reversal relates to the admission of incompetent, irrelevant, and immaterial testimony elicited on the cross-examination of the defendant,

over the objection and exception of counsel for the defendant. The defendant was cross-examined at some length in regard to escaping on two different occasions from the county jail after he had been arrested and charged with this offense. It is contended that to permit such a cross-examination was prejudicial to the substantial rights of the defendant, and improper because the question of the defendant's breaking and escaping from jail was not gone into in his testimony in chief, and for the further reason that the court in effect required the defendant to furnish evidence against himself by permitting the cross-examination to go beyond its legitimate scope.

On the other hand, the Attorney General contends that the cross-examination was proper under the issues in this case, first, because the general subject-matter was gone into by counsel for the defendant in the cross-examination of the state's witnesses in an attempt to prove that the defendant, immediately after he shot and killed Kelly, called the sheriff of Okmulgee county over the long-distance telephone, and requested the sheriff to come and arrest him, and also the defendant, on direct examination, testified that he did not attempt to resist arrest as testified to by Constable Heath, but did not submit to arrest by Heath for the reason that Heath had no warrant for his arrest, and for the further reason that the defendant had called the sheriff and had notified the sheriff that he was ready and willing to surrender; that the defendant, claiming to have been so zealous in his efforts to surrender and place himself in the hands of the law immediately after the commission of the alleged offense, cannot complain of a cross-examination which in effect had bearing on the question of his good-faith surrender by disclosing a disposition on

the part of the defendant to escape jail and flee on two different occasions after he was taken into custody.

Secondly, it is contended that this cross-examination would not constitute reversible error in this case, because it could not have amounted to an abuse of discretion on the part of the trial court in the admission of evidence.

As part of its case in chief, the state was permitted to introduce testimony, without objection by defendant's counsel, to show that the defendant resisted arrest. In explanation of this testimony, the defendant was permitted to testify to the effect that he had no intention to resist arrest, but that nobody other than a constable without a warrant of arrest attempted to arrest him, and in further explanation of his conduct, he was also permitted to testify that he had voluntarily called the sheriff of the county over the long-distance telephone immediately after the shooting, and told him of his willingness to surrender and submit to arrest for this particular crime.

A sharp conflict thereupon arose between the testimony of the witnesses for the state and the testimony of the defendant himself. According to the state's witnesses, the defendant made armed resistance to arrest. This fact was strenuously denied by the defendant, who stated that he was at all times willing to submit to arrest, going so far as to telephone the sheriff to that effect. To rebut the presumption that the defendant was willing to submit to arrest, as testified to by him in chief, and in support of the testimony of the state's witnesses to the effect that the defendant had resisted arrest, the court permitted the county attorney, in his cross-examination of the defendant, to ask the defendant about his escaping from jail on two different occasions and while awaiting trial. We think

this cross-examination was proper under the issues in this case.

A defendant offering himself as a witness subjects himself, as regards cross-examination, to all the rules governing other witnesses. *Harrold, v. Territory,* 18 Okla. 395, 89 Pac. 202, 10 L. R. A. (N. S.) 604, 11 Ann. Cas. 818; *State v. Lewis,* 56 Kan. 374, 43 Pac. 265; *State v. King,* 67 Wash. 651, 122 Pac. 323. The foregoing is the established rule in this jurisdiction.

In *Gibbons v. Territory,* 5 Okla. Cr. 212, 115 Pac. 130, this court held:

"The cross-examination of a witness is not to be confined to the particular questions asked, nor the precise subjects called to his attention on direct examination. The correct rule is to allow the cross-examination to extend to any matter not foreign to the subject-matter of such examination, and tending to limit, explain, or modify the same."

When the defendant takes the witness stand in his own behalf, he is to be considered a witness for all purposes, and is subject to a proper cross-examination upon all matters material to the issues joined. If, on direct examination, he opens a certain subject for investigation, he cannot be heard to complain if on cross-examination questions are asked him, the answers to which would tend to limit, explain, or modify the testimony he has given in chief.

We do not undertake to say that if the trial court would permit the cross-examination of the defendant to go beyond its legitimate scope, extending beyond the subject-matter concerning which he was examined in chief, by such conduct the trial court would not commit reversible error, but such is not the condition confronting us in

this case. The examination here was confined to the issues presented, had a bearing on the question of the defendant's guilt or innocence, and was within the scope of the subject-matters inquired into in the examination in chief. In *Hopkins v. State,* 9 Okla. Cr. 104, 130 Pac. 1101, Ann. Cas. 1915B, 736, this court held:

"On cross-examination of a witness, as a general rule, the party cross-examining should be confined to the matters concerning which the witness has been examined in chief, but this rule should be liberally construed so as to permit any question to be asked on cross-examination which reasonably tends to explain, contradict, or discredit any testimony given by the witness in chief, or to test his accuracy, memory, veracity, character, or credibility. This must necessarily include impeaching questions, although they may relate to matters independent of the questions testified to in chief."

Applying the foregoing rules to the question here presented, we are of opinion that the trial court did not commit error in permitting the defendant to be asked on cross-examination questions regarding his escape from jail and flight after he was arrested and while awaiting trial, for the reasons above stated.

It is also contended that the trial court erred in permitting the defendant to be cross-examined concerning his domestic relations, and relative to a certain letter written by him to his wife while incarcerated in jail; that the only purpose of this examination was to create an atmosphere of "veiled suspicions" that the wife of the defendant was a fallen woman before he married her, and that this fact was known to the defendant; also that the defendant was compelled in said cross-examination to admit that he had written a letter to his wife without asking her to become a witness in his behalf, although requesting her

to produce the defendant's 13-year-old stepdaughter to testify for him.

The general subject of the defendant's domestic relations was testified to by him in chief, the defendant stating that he had reason to believe that his wife and the deceased were guilty of improper relations with each other, and that this illicit relationship had been carried on for some months prior to the killing.' Also the defendant testified of his own volition that after his incarceration in jail his wife left the country with another man, so that no person can read the record in this case without getting the impression that the wife of the defendant was a woman of lewd habits, and that her relationship, especially with the. deceased, was known to the defendant for a considerable length of time prior to the commission of the homicide.

The fact, therefore, that the defendant wrote a letter requesting his wife to produce her 13-year-old daughter as a witness in his behalf, without requesting that she become a witness in his behalf herself, could not have worked any prejudice to his cause under the theory upon which his defense was based. He could hardly have been expected to ask the woman who was sustaining illicit relations with the deceased to be a witness for him, especially after it had become known to him that since the commission of the homicide she had fled from their former home with another man. Her conduct was such as to lead the defendant to believe, as he had a right to do, that her testimony would at least not be favorable to his cause.

In view of the fact that the defendant voluntarily testified as to these illicit relationships between his wife and other men, he certainly cannot now complain that he was prejudiced by a cross-examination which tended to

show only that he was unwilling to use such a woman as a witness in his own behalf. We find no error or abuse of discretion upon the part of the trial court in permitting the defendant to be cross-examined on this subject.

It is also contended that the court erred in refusing to give the defendant's requested instruction No. 1, which is as follows:

"Gentlemen of the jury, you are instructed that the defendant had the right to act upon the appearances of danger as they were indicated to him at the time of the killing. He was not bound to wait until the deceased was in the very act of doing him some great bodily harm, but he had the right to act upon any hostile demonstration, upon the part of the deceased, which indicated to the defendant that the deceased was then about to draw a weapon from his pocket with a purpose, as the defendant thought, to shoot him or do him some great bodily harm.

"What is or is not an overt action—that is, what act upon the part of Kelly, the deceased, would justify the defendant in taking his life—is a question for your determination in the light of all the facts and circumstances which are disclosed by the evidence submitted by both sides. Under some circumstances the slightest movement may justify instant action on the part of the person threatened with danger, upon the ground of reasonable apprehension of danger. Under other circumstances this might not be true, and it is for you, viewing the facts and circumstances in evidence from the defendant's standpoint, to determine how this may be."

Upon the general subject of the requested instruction, the trial court gave the following instructions:

"You are further instructed that the defendant in this case admits the killing of the deceased, but contends that the killing was justifiable on the ground of self-defense, and that, viewed from his standpoint, it became and

was necessary, in order to save his own life, or to protect himself from great bodily harm at the hands of the deceased, to take the life of the deceased; and in this connection you are instructed that in order to justify a homicide on the ground of self-defense it is not necessary that the party killing should have been in actual danger of losing his life, or of receiving serious bodily injury at the hands of the person killed at the time of the homicide, but it is sufficient to justify the killing if the acts or words, coupled with the acts of the party killed, viewed from the defendant's standpoint, were such as to reasonably cause the party killing to apprehend that he was in apparent danger of losing his life, or of having serious bodily injury inflicted upon him by the party killed; he would be justifiable in killing his antagonist, and it is immaterial whether the danger was real or not, it being sufficient in law to justify the homicide if it only be apparent.

"You are therefore instructed that if you believe from the evidence in this case that while the defendant was in his room the deceased came into said room, and that the defendant tried to get him to leave the room and to leave his house, and while thus trying to persuade the deceased to leave that the deceased threw his hand behind him to his hip pocket as though he intended to draw a revolver, and the defendant in good faith believed that he was about to draw a pistol, and that he in good faith believed that the deceased was about to do him great bodily harm, or take his life, and, acting under the circumstances, he shot and killed the deceased, it will be justifiable homicide, and it would be immaterial whether the deceased was armed or not, but if it appeared to the defendant that he was armed, and that he was about to draw his pistol and do him great bodily harm or take his life, the killing, as aforesaid, would be justifiable on the ground of self-defense, and if you so believe from the evidence, it will be your duty to return a verdict of not guilty; and in this connection you are instructed that, after a full and fair consideration of the whole case, if you entertain a reasonable doubt as to whether the killing was justifiable as de-

fined to you in these instructions, you will give the benefit of such doubt to the defendant and acquit him.

"You are instructed what is meant by the term 'reasonable expectation or fear of death, imminent and pressing,' as used in these instructions, is that it is not necessary that the defendant be in any real danger, but apparent danger is enough to excuse him in acting in self-defense; that is, a danger which to his mind was real and imminent, and that the defendant at the time he fired the shot that took the life of the deceased was about to suffer or receive great bodily injury at the hands of the deceased."

It has been repeatedly held by this court not to be error for the trial court to refuse to give a requested instruction if the principles therein contained are covered in the general instructions. *Manning v. State,* 7 Okla. Cr. 367, 123 Pac. 1029; *Miller v. State,* 9 Okla. Cr. 55, 130 Pac. 813; *Ryan v. State,* 8 Okla. Cr. 623, 129 Pac. 685; *Conley v. State,* 15 Okla. Cr. 531, 179 Pac. 480.

The instructions as a whole fully cover the law of the case, and are as favorable to the defendant as the evidence would warrant. A careful reading of the instructions impresses this court that the trial court covered every theory of the defense in a manner fair to the defendant, and as favorable as the evidence justified. We think that the trial court did not err in refusing to give the requested instruction, because the substance of the law therein contained was fully covered by the instructions given.

This killing was the result of too much bad whisky. The defendant admits that he was angry at the time this shooting took place. He had the benefit of very able counsel, who were zealous in their endeavor to protect his rights at every step throughout the trial. That a conviction of manslaughter only resulted is attributable rather

to the able manner in which he was defended than to his own testimony and conduct at the time of the killing and subsequent thereto.

The defendant was unfortunate in having selected as his mate a woman of loose character, untrue to her marriage vows. In this respect he is to be pitied; but, as held in *January v. State,* 16 Okla. Cr. 166, 181 Pac. 514, "the so-called unwritten law—'the right to avenge wrongs done a female member of a defendant's family by killing the wrongdoer'—does not exist in this state."

For the reasons stated, the judgment is affirmed.

DOYLE, P. J., and ARMSTRONG, J., concur.