# PHIL KENNAMER v. STATE.

No. A-8937.   March 14, 1936.
Rehearing Denied April 17, 1936.
(57 Pac. [2d] 646.)

148

150

152

156

158

160

162

164

166

C. B. Stuart, A. Flint Moss, C. A. Coakley, and Mc-Collum & McCollum, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Smith C. Matson, Asst. Atty. Gen., Holly Anderson, Co. Atty., and W. F.

Gilmer, Jr., and Tom L. Wallace, Asst. Co. Attys., (J. Berry King, of counsel), for the State.

DOYLE, J. (after stating the facts). Appellant, Phil Kennamer, was informed against and tried of having murdered John Gorrell, in Tulsa county. The jury brought in a verdict of manslaughter in the first degree, but were unable to agree upon the punishment. A new trial was denied. Thereupon the court sentenced appellant to imprisonment in the state penitentiary for a term of 25 years.

Upon a petition alleging numerous assignments of error, counsel for appellant have brought the record to this court for review, upon which they ask that the judgment be reversed.

Considering the assignments in the order in which they appear in the record, the fifth and sixth assignments of error are based upon the action of the court in permitting the cross-examination of the witness Franklin E. Kennamer upon the subject of an interview published in the Tulsa Tribune.

Judge Kennamer, father of the defendant, testified at length as to the conduct, actions, and declarations of his son Phil from the time of his birth up to the night of the tragedy. He stated that he had sent him to the New Mexico Military School, at Roswell, in 1930; that he ran away from there the following spring; that in 1931 he sent him to the Southeastern Normal School, at Durant; the next year his mother being in poor health went to San Angelo, Tex., taking him with her; that he disappeared from San Angelo; later he was located at New Orleans, and from there he went to Miami, Fla.; that he made two trips to New York, and he sent him to Los Angeles, Cal.; that when he returned to Tulsa

he entered high school, later quit high school, attended Cascia Hall three or four months; that he had a very emotional disposition and at times he was very unreasonable in his conversations and actions; that he had told him seriously that he was well equipped in knowledge of military tactics and wanted to join a revolution in some foreign country. On some occasions when he was despondent he talked of joining the French Foreign Legion, saying it would be a good way to banish himself from decent society; that he secured various positions for his son, when he started out to make a living for himself, and he would work a few weeks and quit; that Thanksgiving evening, between 7 and 7:30 he took Phil in his car to the Crawford Drug Store, about three blocks from his home and across the street from St. Johns Hospital, gave him 50 cents, and told him to get some cigars and bring them out to the car. When he came back he said, "Phil, you had better get in the car now and go back home with me, this is a bad night, I would like for you not to be out," and he promised him he would come home early. That he came home that night between 12:30 and 1 o'clock.

He further testified as follows:

"By Mr. Moss: Q. Judge, please, sir, did Phil ever discuss with you the subject of what he should do in the event that he ascertained the existence of a kidnapping plot or kidnapping plan, or kidnappers engaged in plying their trade? A. This last summer he discussed very seriously with me that subject. Q. Will you tell the court and jury about that, please, sir? A. He asked me one night after supper, I was in the front room reading, and he came in, and he said, 'Dad,' he says, 'If I knew of a bunch of blackmailers, kidnappers and extortionists, don't you think it would be a fine thing if I would catch them?' And I turned around to him, I was really astounded at the statement. I said, 'Phil, you couldn't get that information or have any knowledge of any such

thing as kidnappers and extortioners and blackmailers except from a bunch of gangsters; that is the only kind of people that engage in that kind of business.' And I says, 'That would never do on earth for you to undertake any such thing of that kind because you are liable to get killed and get all of the family killed.' I said, 'Furthermore, if you ever hear of any such thing as that, you come and report to me, and I will turn it over to the postal authorities and the department of justice agents that are employed by the national government to run down that kind of people and that kind of business.' Well, he said he thought it would be a good thing to catch them. I says, 'Sure, it would be a good thing, and they ought to be caught, all right, but you are not the one to do the catching.' That is about the substance of the conversation."

He further testified:

"Q. Now, then, keeping in mind, please, Judge, all of these things that you have known about Phil through the years, which you have heretofore detailed, his conduct and demeanor during the fall of 1934, keeping in mind, too, please, sir, his condition on the night when this killing took place, and acting upon the assumption that it did occur sometime between 11:30 and 12:15 or 12:30, tell the jury whether or not in your judgment on that night, as you knew your son Phil, he was rational or irrational? A. I have no doubt at all that he was irresponsible and irrational.

"Q. In your judgment did he that night understand and appreciate the consequences of his own acts, or know the difference between right and wrong? A. I do not think so."

Cross-examination by assistant county attorney, Gilmer:

"Q. Judge, let me ask you this: Did you on the 24th day of September, 1933, say to a correspondent of the Tulsa Tribune, referring in particular to the Machine Gun Kelly trial, this or this in substance: 'The government has had enough of this kidnapping nonsense, and

it intends to quash it now, and what is more, the government can do it. Criminals of course are just as individual as are law-abiding citizens. There are fat criminals and lean criminals; strong criminals and weak crminals; smart criminals and stupid criminals; but in my observ· vation extending over a number of years, I have come to the conclusion that most of them, the habitual type especially, have one trait in common, namely a strange quirk of mind which gives them an anti-social tendency; it is not strong enough to be classed as insanity, but it is akin to it.' Did you make that statement? A. No, I never made any such statement.

"Mr. Moss: I object.

"A. I want to answer that. If the Tulsa Tribune has got any interest in this case, I will answer it now, and I think they have. The latter part of the statement, that is not my language at all, I don't speak that language. I just said that the government of the United States was able to cope with the kidnapping situation, yes, sir.

"Well, Judge, do you agree or do you disagree with the sentiment expressed in that?

"Witness: Let me answer that.

"Mr. Stuart: Your Honor, if he is going to lay the basis for impeachment, he has got to name the time, place and man.

"The Court: If this is for the purpose of impeachment, you will have to lay the foundation by showing the time and place and person to whom the statement was made.

"Mr. Gilmer: I have shown the time and place, Your Honor, on September 21, 1933, and in your chambers.

"By Mr. Stuart: Name the man.

"Q. To Mr. Jenkin Jones, the correspondent of the Tulsa Tribune. A. Not the statement you have read. I made a statement to him.

"A. I can tell the substance of the statement I made to him, I believe it was following the conviction of somebody charged with kidnapping. He was going around town, seeing what different people thought about the conviction and what they thought of kidnapping, and I said to him the government of the United States in my judgment was able to cope with the situation, and I still think so. I said furthermore criminals of course are just as individual as law abiding citizens. I did not use the words 'fat criminals and lean criminals,' but I said there were different classes of criminals. I said to him that there were criminals of organized bands and criminals that were individual criminals; criminals of petit crimes and criminals of high crime, and I still think that is correct. This statement is about like the usual garbled newspaper story.

"Q. With particular reference, Judge, to that part of it about criminal insanity, do you recall whether or not you made that part of the statement, that particular portion of it? A. I don't remember that I ever made any statement to him about any insanity of criminals. Oh, I may have stated to him, yes, that confirmed criminals were of a peculiar type, in other words I tried to convey: And this word 'quirk' is, I know that is not my language, that part of it, but the idea was that a confirmed criminal has a peculiar mind. In other words, he becomes a diseased criminal. Q. I see, then the part there 'but that is not insanity, but is akin to it,' do you recall that particular portion of it, Judge? A. I don't recall very much about it, except as I have stated to you."

After the defendant rested, Jenkin L. Jones was called by the state in rebuttal and testified:

"I am a newspaper reporter on the Tulsa Tribune, I had occasion to talk with and interview Judge Kennamer in his Chambers in the Federal building in Tulsa, on the occasion of the Machine Gun Kelly trial in Oklahoma City. This article is not an accurate, definite quotation of Judge Kennamer's language. I used some words in there that

possibly the Judge never used. That is what the Judge told me in substance as near as I can recall."

Counsel for appellant in their brief say:

"That this irrelevant and incompetent interview with Judge Kennamer was forced into this case, contrary, we think, to every known rule of evidence, and could not have been done except for the purpose of prejudicing the minds of the jurors against the testimony of Judge Kennamer. And that the trial court committed manifest error in permitting Mr. Jenkin Jones to testify with reference to this interview."

No authorities were cited upon this last proposition.

We do not agree with counsel's contention.

As to what is the proper practice on cross-examination of witnesses, there are two well-recognized rules, known as the English or orthodox rule, and the so-called American rule. In some cases the orthodox rule obtains in all civil cases, and in respect to the cross-examination of witnesses for the prosecution in criminal cases, while the American rule governs the cross-examination of witnesses for the defense. According to the orthodox rule, the opposing party is not confined in his cross-examination to matters upon which the witness is examined in chief, but may extend the cross-examination to every issue in the case. According to the American rule, a party has no right to cross-examine any witness except as to facts and circumstances connected with the matters stated in the direct examination.

In some jurisdictions where the American rule is followed, it is held that the trial court may, in the exercise of sound discretion, relax the rule and allow the cross-examination to extend to matters pertinent to the issue, but not within the scope of the direct examination.

This court in Hopkins v. State, 9 Okla. Cr. 104, 130 Pac. 1101, Ann. Cas. 1915B, 736, held that:

"On cross-examination of a witness, as a general rule, the party cross-examining should be confined to the matters concerning which the witness has been examined in chief, but this rule should be liberally construed so as to permit any question to be asked on cross-examination which reasonably tends to explain, contradict, or discredit any testimony given by the witness in chief, or to test his accuracy, memory, veracity, character, or credibility. This must necessarily include impeaching questions, although they may relate to matters independent of the questions, testified to in chief."

The extent, manner, and course of the cross-examination of a witness, even though it extends to matters not inquired about in his examination in chief, is very largely subject to the control of the court in the exercise of a sound discretion, and unless it affimatively appears that this discretion was abused, the rulings of the court will not be reviewed on appeal. Hopkins v. State, supra.

In the case of Creek v. State, 16 Okla. Cr. 492, 184 Pac. 917, it was held by this court that:

"The cross-examination of a witness is not to be confined to the particular questions asked, nor the precise subjects called to his attention, on direct examination. The correct rule is to allow the cross-examination to extend to any matter not foreign to the subject-matter of the examination in chief, which tends to limit, explain, or modify the same."

Regardless of the rule as to the scope of cross-examination on material matters, it is always permissible on cross-examination to lay a foundation for impeaching a witness by proving prior contradictory statements. Not only may a witness' inconsistent statements be proven, but his inconsistent acts and conduct may be shown also.

It is said that contradictory statements of a witness, to be admissible for the purpose of impeachment, must be material to the issue, and must also ordinarily be a statement of facts and not a mere opinion of the witness, though it would seem that this would not be true of an opinion contradictory of another opinion, where both are based on the same set of facts.

It is also said that if there is an inconsistency between the belief of a witness as indicated by his declarations prior to the trial and his belief as indicated by his examination in chief, the prior declarations may be shown by way of impeachment. 28 R. C. L., pars. 219, 220.

The seventh assignment of error is based upon the action of the court in permitting Mr. King, special prosecutor, to ask Dr. Menninger on his cross-examination the following question: "Q. If you were a composite jury, if you had the power that these twelve men are going to have, to dispose of this defendant, now from your standpoint, what would you do with him?" The record shows that Dr. Menninger qualified as an expert in the field of psychiatry. It appears that he had graduated at Harvard and other universities in this country and abroad, was the author of what is admitted to be an outstanding book upon this question, "The Human Mind," and was the director of the clinic at the Menninger Sanitarium at Topeka, Kan. The whole course of Dr. Menninger's testimony has tended to support the contention of counsel that the defendant was insane and should have confinement and treatment to bring about, as counsel expressed it, "a restoration to sanity upon his part." The witness answered: "I would recommend that he be confined in such a way that he could be guarded as much as possible against escape, until he is adjudged cured by an impartial ap-

pointed group of psychiatrists, that is, he should have confinement and treatment."

Our Penal Code (section 1797, St. 1931) provides:

"All persons are capable of committing crimes, except those belonging to the following classes:  * * *  Fourth. Lunatics, insane persons, and all persons of unsound mind, including persons temporarily or partially deprived of reason, upon proof that at the time of committing the act charged against them they were incapable of knowing its wrongfulness."

In the case of Alberty v. State, 10 Okla. Cr. 616, 140 Pac. 1025, 1029, 52 L. R. A. (N.S.) 248, it is said that:

"Under this provision the test of criminal responsibility for committing an act which is declared to be a crime is fixed at the point where the accused has the mental capacity to distinguish between right and wrong, as applied to the particular act, and to understand the nature and consequences of such act." Smith v. State, 12 Okla. Cr. 307, 115 Pac. 699; Roe v. State, 17 Okla. Cr. 587, 191 Pac. 1048.

In the case of Adair v. State, 6 Okla. Cr. 284, 118 Pac. 416, 420, 44 L. R. A. (N.S.) 119, it is said:

"It is immaterial what standard scientists or medical experts may fix to determine, or by what rules they determine, that a person is in a state of insanity; the accused under this provision of the law is a lunatic, or insane, or of unsound mind, or temporarily or partially deprived of reason, to such an extent as will excuse him from criminal responsibility, only when he is incapable of knowing the wrongfulness of the act committed and charged, and incapable to understand the nature and consequences of such act, and this is a question of fact for the jury to determine under all the evidence in the case.  * * *

"Every defendant is presumed in law to be sane and capable of knowing right from wrong, and able to choose between them. This presumption, however, upon a trial

for murder, is overcome whenever evidence is adduced sufficient to raise a reasonable doubt of the defendant's sanity at the time of the commission of the homicide. The law thereupon imposes upon the state the burden of establishing the sanity of the defendant the same as any other material fact necessary to warrant a conviction; that is, beyond a reasonable doubt."

Where one is being tried for murder, and his defense is insanity, lunacy, or unsoundness of mind at the time of committing the act, the defendant, in the first instance, is presumed to be sane and of sound mind, and the burden is upon him to introduce sufficient evidence to raise a reasonable doubt as to his sanity. When he has done this, the state, before a conviction can be had, is required to prove his sanity beyond a reasonable doubt.

In the course of the opinion in the Adair Case, supra, it is said:

"Modern research has done much to elucidate what was formerly very obscure touching the true pathology of insanity, although no invariable or infallible test of the existence of insanity has ever been found. Says Mr. Bishop:

" 'Many attempts have been made to discover, what has been assumed to exist, a form of words, termed a test of insanity, which, put into the hands of jurors, can be used by them as a sort of legal yardstick, to measure the evidence and determine whether or not the prisoner had a sufficient length of mental alienation to escape responsibility for his act. But the test has never been found, not because those who have searched for it have not been able and diligent, but because it does not exist.' Bish. New Crim. Law (8th Ed.) § 381.

" 'The symptoms and causes of insanity are so variable, and its pathology so complex, that no two cases may be just alike. The fact of its existence is never established by any single diagnostic symptom, but by the whole body

of symptoms, no particular one of which is present in every case.' Ray's Med. Jur. Ins. par. 22.

"Persons suffering from this unhappy malady are here placed under the care and custody of the state by laws requiring their confinement in state asylums and hospitals for treatment. The establishing of asylums and hospitals for the insane, and the enactment of laws requiring the compulsory confinement of persons accused and acquitted of crime on the ground of insanity, has in a large measure tended to relax the rigid rules which once governed this defense."

See section 3106, St. 1931.

We deem it sufficient to say that adhering to the rule heretofore stated, we do not think the question was improper and prejudicial.

After a careful examination of the record and the exceptions taken to the rulings of the court on the admission and rejection of testimony, we are satisfied that, within well-settled rules sustained and upheld by the decisions of this court, no material error was committed by the court in any of its rulings.

The next assignment of error is:

"Unethical, unfair and prejudicial conduct of the attorneys for the state in presenting as a witness Mrs. O. L. Harman, whose testimony and conduct before the jury was highly prejudicial, and whose testimony the state's attorney knew before they introduced her was prejudiced."

It appears from the record that Mrs. O. L. Harman, the fifth witness called by the state, testified in part as follows:

"Q. Do you know the defendant, Phil Kennamer? A. Honorable judge, I am afraid to testify in this case; my life has been threatened, and my family—

"Q.   Just wait a minute.

"Mr. Moss:   I want her to tell it all.

"Mr. Anderson:   If she wants to tell something to the judge—

"Mr. Moss:   That is all right, let's let the jury and all hear it; we don't want to have any secrets in this lawsuit.

"The Court:   Go ahead.

"A.   I am afraid to testify in this case and I want to be excused from it.   My family has been threatened time and time again in the last 24 hours, they have been threatened with death, and that they would get me if I go up and testify; they have had that threat put up to them time and—

"Mr. Moss:   That isn't the reason she is afraid to testify; I know this woman.

"The Court:   Mrs. Harman, you have been subpoenaed here and you must answer the questions now as they are asked.

"The Witness:   I am sorry I will have to refuse.   My children means more to me than anything on earth, and I will have to take whatever the penalty is.   But when my little girl says to me, 'Mother, don't testify in this case.' They have called and told them, they have told my children they would kill them and kill me.

"Mr. Moss:   I now move the court to strike from the consideration of the jury all statements made by this witness and to declare this a mistrial because of the prejudice resulting from these bombastic statements made by this witness.

"Mr. Anderson:   If the court please, I ask this witness not to talk, and Mr. Moss insisted that she do.

"The court excuses the jury.

"The Court:   I want to make this record now.   Mr. Moss, if the court will admonish the jury to disregard not

only the statement that she has made here, but the county attorney will withdraw from the consideration of the jury the statement with reference to what her testimony would be, is there any objection then to proceed with the trial?"

A statement was drawn up withdrawing that part of the opening statement made by Mr. Wallace in reference to Mrs. Harman's testimony; Mr. Anderson, the county attorney, made this statement:

"Now if the court please, the scene just created in this court room a little while ago had undoubtedly left some influence, some coloring upon the minds of the jury in this case. For that reason I want to join the defense counsel in requesting that this be declared a mistrial, and I furthermore want to reiterate that this witness be held for further action of this court.

"Mr. Stuart: Now, your Honor, let's see about this. We made a motion to have a mistrial take place here. It is the duty of the court of course to try and dissipate and destroy whatever influence was carried by this scene from this stand. When we went out these gentlemen came to me, Mr. Johnson did, and asked me if he made a statement, if we would withdraw our motion to declare a mistrial, leading us to believe that if we did that, it would be perfectly satisfactory to the state.

"Mr. Anderson: I still insist on a mistrial, I confess the motion.

"Mr. Moss: I withdraw the motion so that we have nothing to confess.

"Mr. Stuart: Your Honor will have power to tell this jury to disregard everything that occurred. This is not the first time that these untoward things have occurred in courts of justice. You should tell the jury to disregard it all, and now you are going to tell the jury to withdraw this statement.

The Court: You gentlemen come up here, I want to confer with you.

"Following this conference:

"The Court: Gentlemen of the Jury, I am going to ask you this question: Is there a man on this jury who would be influenced either for the state or for the defendant by what has occurred with reference to the testimony of this lady, who was put on the stand, Is there a man who will be influenced in any way, or let it influence your verdict in this case? If so, hold up your right hand.

"The Court: You gentlemen tell me then on your oaths that you will not be influenced by what has happened here in the court room? Do you all do that?

"The Court: Is there a man on the jury who is prejudiced against either side in this lawsuit by reason of what has happened with reference to Mrs. Harman?

"The jurors make no answer.

"The Court: What do you all say about that, you men know?

"All jurors answer: I am not.

"The Court: You would not be. In view of the answers of the jury I am going to proceed with the trial of this lawsuit, but I am going to admonish the jury now that they must not permit this incident to influence you in the least in the trial of this lawsuit. Call your next witness for the state."

Thus it appears that the defendant in the lower court expressly waived the right he otherwise would have had to claim that he should be granted a mistrial by reason of the misconduct of this witness. The state offered the defendant a mistrial; the defendant refused to accept it.

The irregularity now complained of was not presented as a ground for a new trial in either the first or subsequent motion for a new trial.

In the case of White v. State, 23 Okla. Cr. 198, 214 Pac. 202, 205, this court held that:

"Where a constitutional right is for the sole benefit of the accused, in the nature of a privilege, that right may be waived by express consent or by implication, from conduct indicative of consent; or by failure to claim or assert the right in seasonable time."

In Daniels v. State, 55 Okla. Cr. 298, 29 Pac. (2d) 997, this court held:

"A defendant in a criminal case may waive any right not inalienable, given him by the statute or by the Constitution, either by express agreement or conduct, or by such failure to insist upon it in seasonable time as will operate as an estoppel to his afterwards setting it up against the state."

It is so well settled as to be elementary, that the doctrine of waiver and estoppel applies to a defendant in a criminal case, and he cannot be permitted to take one position in the court below and assume an entirely different position in the appellate court. Bishop's New Criminal Procedure, pars. 117, 118, 119.

We have often held that only those questions can be considered on appeal, unless jurisdictional or of a fundamental character, which were raised in the trial court on exceptions taken, and unless incorporated in the motion for a new trial, and thereby submitted to the trial court, the same will not be considered on appeal. Dooling v. State, 3 Okla. Cr. 491, 106 Pac. 982; Mitchell v. State, 7 Okla. Cr. 563, 124 Pac. 1112; Cardwell v. State, 20 Okla. Cr. 177, 201 Pac. 817; Signs v. State, 35 Okla. Cr. 340, 250 Pac. 938.

It appearing that this assignment does not set forth any jurisdictional or fundamental error, it was waived by failure to present it to the trial court in the motions for new trial.

The next assignment is that the court erred in giving instruction No. 13.

It appears that at the close of the testimony the defendant's counsel presented a body of instructions and asked the court to give them to the jury, which request was refused. It also appears that the defendant's counsel took an exception to each instruction given by the court.

No assignment is urged here as to the giving or refusal of instructions except on account of the giving of instruction number 13.

The criticism directed against this instruction is that it is in effect a charge upon the weight of the evidence.

This instruction reads as follows:

"No. 13. You are further instructed that even if John Gorrell had planned and threatened to kidnap Virginia Wilcox for the purpose of extorting money from her father, and was about to carry such plan into execution, nevertheless the defendant had no right to kill him to prevent the plan being carried out. Therefore, if you believe beyond a reasonable doubt that the defendant killed John Gorrell for the sole purpose of preventing him from carrying out said plan to kidnap Virginia Wilcox in order to extort money from her father, and the same was done with a premeditated design to effect the death of said John Gorrell, then and under those circumstances you should convict him of murder, unless you believe from the evidence, or entertain a reasonable doubt thereof, that the defendant is justifiable on the ground of self-defense, or that the defendant was insane at the time he fired the fatal shots."

We have uniformly held that the instructions given by the court must be construed as a whole. The instructions fully, fairly, and correctly state the law of the case, and the instructions on the question of insanity, when con-

sidered altogether, state the law fully and very liberally for the defendant. We think this assignment is manifestly without merit.

One of the grounds of the motion for a new trial, and upon which error is assigned, is that assistant county attorney, W. F. Gilmer, during the closing argument, made use of inflammatory language while referring to the defendant, which was entirely unwarranted by the evidence, and made other remarks that were improper and prejudicial.

It appears from the record, however, that no objection was made at the time, nor was the attention of the trial court in any manner called to the alleged abuse of privilege.

The record shows that the opening arguments were made by Mr. Wallace, for the state, and Mr. Moss for the defendant, followed by Mr. King for the state and Mr. McCollum for the defendant, then Mr. Rowe, for the state.

The closing arguments were made by Judge Stuart for the defendant and Mr. Gilmer for the state, which is the only argument appearing in the record. The following excerpts of Mr. Gilmer's closing argument appear in the briefs:

"Judge Stuart says, 'Let's tear off the veil.' All right, judge, you won't have to wait, because I am going to tear it off and I am going to tear it into shreds so nobody can put it back on again, if there is any veil there.

"Here is what we are up against, and you gentlemen of the jury, and it is borne out by the record in this case. We are fighting the strong influence and deliberate influence of the federal court of our district. We are fighting that and they are using it and I wouldn't mention it if they hadn't done it first. All right, we are fighting that.

"Then we have got more than that to contend with. We have got the unlimited wealth in the northern part of the state of Oklahoma to fight, that is what we are up against, and you gentlemen have got to believe that we are sincere, and that we are fighting to the very best of our humble ability. We have got to believe that, we have shown it."

And again he said:

"Now, here is a thought that occurred to me during the trial of this case, and I think possibly you gentlemen might have noticed that. I left that out a while ago when I was telling you the proposition we were up against about getting somewhere in the conviction for this murder.

"You have noticed every day, I presume, that even after his honor comes in and sits down on the bench, and everybody is seated, then in walks some spectators, all dressed up in expensive clothing; I don't know who they are or from whence they come, but it takes money to get yourself a reserved seat in the front row in the trial of this case.

"And let me tell you this. If it didn't just happen that you twelve men were just called in here as jurors, as a coincidence, and if it didn't happen that I just came here on the prosecution side of this case and have got me a chair that they can't take away from me, do you think that us boys could have got in here on a front seat? You know good and well we couldn't. We would have been lucky to get in here at all, much less walk in after the judge sits down, and take a seat that has been reserved.

"I don't know how they do it, but they didn't do it without money, I tell you that.

"You have got a picture of one industrious boy and then you have got a picture of a pampered wastrel, that it what you have got. And it is a clear enough picture that anybody in the world can see it. Killer, kidnapper Kennamer, there he sits, that is what he is and you know

it and I know it, and I think Flint Moss and C. B. Stuart know it."

And again:

"Now, I am going to close. There has been something said about what to do with the defendant. I am going to tell you what I think ought to be done, and I am going to give you my reason for it, and you can take it for what it is worth.

"I tell you what I think of the punishment in this case. They all say that he ought to be confined; nearly everybody in the case said he ought to be sent to some institution. All right. Now Dr. Griffin says, 'I have got no place in my institution for him; he should go to a penal institution.' That is a penitentiary. That is what they all say.

"Now, let me tell you this, I am sincere in it, and I mean no disrespect to anyone, but as sure as you send that boy to the penitentiary, as sure as you do, the natural reaction on the part of his father—so help me, my own father would do the same thing, and I would honor him for it, but on the day he is sent down there, he is going to start trying to get him out, and I don't blame him for doing it, my father would do the same thing, but he is going to try to get him out the day you put him in.

"So on behalf of the state of Oklahoma, I am going to ask you to inflict the extreme penalty and send this boy to the electric chair, with the same calm, cool, deliberate action that on Thanksgiving night, 1934, he sent the immortal soul of John Gorrell hurtling into eternal oblivion. Send him down there and rub him out."

There have been innumerable decisions in different jurisdictions as to when improper remarks by prosecuting attorneys in their arguments to the jury require a reversal and a new trial. It is impossible upon such a subject to formulate a general rule infallibly applicable in all cases. Each case is tested by itself in a measure.

This court, in Nance v. State, 41 Okla. Cr. 379, 273 Pac. 369, 372, said:

"The settled rule is that the prosecuting attorney has the right and privilege in his argument to the jury to refer to the evidence, and state his deductions therefrom, and urge upon the jury the truth or falsity of any testimony given in the case, and the remarks of the prosecuting attorney in his argument will be considered and construed in reference to the evidence. In order to constitute reversible error, the impropriety indulged in must have been such as may have improperly influenced the verdict."

In Allen v. State, 13 Okla. Cr. 395, 164 Pac. 1002, L. R. A. 1917F, 210, it is said:

"In our opinion, this argument could have been cured by its withdrawal from the consideration of the jury by the trial court, and counsel for the appellant should have requested its withdrawal in order that the court might have cured the error, if any. This was not done. Counsel at the time only saw fit to object and take an exception without any ruling by the trial court upon the impropriety of certain of these remarks. Others the trial court of its own motion, as heretofore indicated, saw fit to withdraw and admonished the jury not to consider. It is not every species of improper argument that justifies this court in reversing a judgment of conviction. * * *

"We hold, therefore, that where the guilt of the appellant is clearly established, and there is no good reason to believe that upon a second trial an intelligent and honest jury could or would with reason and propriety arrive at any other verdict than that of guilt, a new trial will not be granted except for fundamental error."

This court in Brown v. State, 52 Okla. Cr. 307, 4 Pac. (2d) 129, 130, held that:

"The right of argument contemplates a liberal freedom of speech, and the range of discussion, illustration,

and argumentation is wide. Counsel for both the state and the defendant have a right to discuss fully from their standpoint the evidence and the inferences and deductions arising from it. It is only when argument by counsel for the state is grossly improper and unwarranted upon some point which may have affected defendant's rights that a reversal can be based on improper argument."

It is earnestly insisted that "the court erred in not controlling the above argument even though no objection was made in the court below, bearing in mind that the court below did not stop the argument; did not reprimand the attorney or advise the jury not to consider his improper remarks." Citing and quoting from opinions in the following cases: Holcomb v. State, 16 Okla. Cr. 1, 166 Pac. 755; Berger v. United States, 295 U. S. 78, 55 S. Ct. 629, 79 L. Ed. 1314; Akin v. State, 86 Fla. 564, 98 So.. 609; Read v. United States (C. C. A.), 42 F. (2d) 636.

This court in Ussaery v. State, 22 Okla. Cr. 397, 212 Pac. 137, held that:

"When the entire argument on both sides is not before the court, and the county attorney contends that his argument is in reply to argument advanced by defendant's counsel, and the trial judge overrules the objection to such argument, this court will not pass on the alleged error, unless the argument complained of constitutes a violation of some constitutional or statutory right of the defendant. Under such circumstance the presumption will be indulged on appeal that the trial judge ruled that such argument was permissible as reply argument, as the burden is upon the appellant to affirmatively show error in the ruling of the trial court."

In Wilson v. State, 24 Okla. Cr. 332, 217 Pac. 885, it is held that:

"Ordinarily error cannot be predicated upon mere unexplained excerpts from the remarks of counsel to the

jury. Enough must appear of record to advise the appellate court of what preceded the alleged objectionable remarks and their meaning to be deduced from the context, and whether or not they were invited or provoked by remarks made by opposing counsel."

In order for this court to review errors assigned, error must affirmatively appear from the record. It is never presumed. Every presumption favors the regularity of the proceedings had upon the trial. The settled rule, often announced by this court, is that the plaintiff in error must affirmatively show prejudicial error; otherwise, the judgment of the lower court will be affirmed. Killough v. State, 6 Okla. Cr. 311, 118 Pac. 620; Keeter v. State, 15 Okla. Cr. 139, 175 Pac. 263; Proctor v. State, 22 Okla. Cr. 445, 211 Pac. 1057; Bird v. State, 40 Okla. Cr. 80, 267 Pac. 281.

In the recent case of Cummings v. State, 57 Okla. Cr. 428, 48 Pac. (2d) 879, it is held:

"To preserve the question of alleged misconduct of the county attorney in his argument to the jury, the attention of the court should be called to the argument at the time by proper objection and a ruling had, thereon and an exception to the adverse ruling reserved and the same assigned as error in the motion for new trial and the petition in error. When this is not done, the question is not presented to this court for review."

This court in Payne v. State, 21 Okla. Cr. 416, 209 Pac. 334, held that:

"Where the record is incomplete touching upon alleged disparaging remarks made in the closing argument, this court will presume that the trial court ruled correctly."

In most instances reversals have been ordered for improper remarks where the prosecuting attorney asserted and argued facts not in evidence bearing upon the guilt of the defendant, and in few for intemperate abuse of the

defendant.   Thurmond v. State, 57 Okla. Cr. 388, 48 Pac. (2d) 845.

The sole object of all argument is the elucidation of the truth, greatly aided in matters of fact as well as in matters of law by full and fair forensic discussion.   Argument may violate ethics and not violate law.   It may be improper, but not illegal.   Improper remarks by the prosecuting attorney in the argument do not require a reversal, where they appear to be strictly in reply to allusions of counsel for the defendant.

Even if it were to be conceded that the language of Mr. Gilmer was somewhat outside of the pale of legitimate argument, it does not affirmatively appear that counsel abused his privilege, or that it was the duty of the trial court to interfere.

We are satisfied that the contention of counsel for appellant is untenable for another reason.   In this connection the trial court gave instruction No. 17, which reads as follows:

"You will now listen to the argument of counsel, and you are instructed that the argument constitutes a material and legitimate part of the trial, and you should carefully hear and consider any suggestions made by counsel when it tends to aid or assist you in analyzing the testimony of the witnesses and applying the law as given by the court, taking care however that such argument be not conflicting with the testimony of the witnesses, nor the instructions herein given you.   You should entirely disregard any statement of counsel not based on the evidence, or which is not a fair deduction therefrom, and you should also disregard any question that may have been asked to which the court sustained an objection."

Finally, it is urgently insisted that the punishment imposed is excessive.

Counsel in their brief say:

"Assignment of error number 15 suggests that the sentence imposed by the court is excessive, and, under the evidence, amounts to cruel and unusual punishment."

The record shows that the supplemental motion for new trial filed March 1, 1935, concludes as follows:

"This excessive punishment, we believe, and, therefore allege the facts to be, was brought about by the trial court's being temporarily swept off his feet by the clamor of the public press; that, during the trial of this cause, there were approximately forty newspaper reporters and agents of newsgathering agencies furnished special seats and accommodations in and about the front portion of the courtroom; by reason of their presence, the atmosphere was charged with their mania for making this a nation-wide trial—a big event. The presence of these reporters and news-gathering agents was everywhere during the trial of the cause and during periods of recess. Late editions of the paper were present, not only in the courthouse, but on the floor of the courthouse where this trial was being held. Even newsboys were selling these papers in the corridors of the building and on the floor of the building where the trial was being had. These papers, in their news comments as well as editorials, were demanding the conviction and punishment of this boy. For these reasons, we allege the facts to be that the trial court was unconsciously influenced by this clamor and bedlam, this spirit of a Roman holiday.

"Premises considered, this defendant asks that said judgment and sentence be vacated and set aside and that he be given a new trial, or, if a new trial be denied, that said sentence be reduced to the minimum of four years, so that this mentally sick boy can be recovered, perhaps, within time to save, if possible, what remains of his mentality."

Where the evidence is so conclusive and convincing of the guilt of the defendant of the degree of the crime

of which the jury found him guilty, before this court may modify the judgment and reduce the punishment it must clearly appear that the court abused its judicial discretion in assessing the punishment.

In the light of the facts of this case we are of opinion that the court did not err in overruling the supplemental motion for a new trial.

The defendant was ably represented in the trial court, and his rights fully protected in every respect, throughout the trial and in this court. However, it is our conclusion after reading this voluminous record, covering over nine hundred pages, with great care, and having weighed with all due consideration every objection urged by counsel for appellant to the trial which was accorded him, that no error was committed to his prejudice; and upon the whole case we are satisfied that the defendant, beyond all reasonable doubt, had a fair and impartial trial before an unbiased jury, free from any undue influence of prejudice or passion; and this is all to which he was entitled.

It follows that the judgment of the trial court should be affirmed, and it is so ordered.

EDWARDS, P. J., and DAVENPORT, J., concur.